T.C. Memo. 1998-204


UNITED STATES TAX COURT


JANE CROCKER, F.K.A. JANE C. JACOBS, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11020-94, 11022-94,   Filed June 8, 1998.
    11985-94, 11986-94.


  Peter S. Buchanan, for petitioner Jane Crocker.

  John Gigounas, Edward B. Simpson, and Todd M. Moreno, for
petitioner Justin M. Jacobs, Jr.

  Elizabeth L. Groenewegen and Bryce A. Kranzthor, for
respondent.

---

  [1] Cases of the following petitioners were consolidated
herewith for trial and opinion but not for briefing:  Jane
Crocker, docket No. 11020-94; Jane Crocker, docket No. 11022-94;
Justin M. Jacobs, Jr., docket No. 11985-94; and Justin M. Jacobs,
Jr., docket No. 11986-94.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, an addition to tax, and penalties as follows:[2]

Jane Crocker, docket No. 11020-94, and Justin M. Jacobs, Jr., docket No. 11985-94:

| Year | Deficiency | Addition to Tax Sec. 6653(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|-------------------|------------------|
| 1988 | $152,905 | $7,645 | |
| 1989 | 187,343 | | $37,469 |

Jane Crocker, docket No. 11022-94:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|------------------|
| 1990 | $8,621 | $1,724 |
| 1991 | 26,842 | 5,368 |

Justin M. Jacobs, Jr., docket No. 11986-94:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|------------------|
| 1990 | $395,134 | $79,027 |

---

[2] Respondent issued one notice of deficiency for taxable years 1988 and 1989 to petitioners, each of whom filed a separate petition with the Court. Respondent also issued separate notices of deficiency, one to petitioner Justin M. Jacobs, Jr., for the year 1990, and the other to petitioner Jane Crocker for the years 1990 and 1991. Each petitioner filed a separate petition with the Court with respect to these notices.

After concessions,[3] the issues for decision are: (1) The fair market value of improved real property and personal property donated by petitioners to an eligible charitable donee for purposes of determining the allowable charitable contribution deductions under section 170 to which petitioners were entitled for 1986, the year of the gift, and for the years 1988, 1989, 1990, and 1991 by way of carryovers; and (2) whether petitioner Justin M. Jacobs, Jr. is liable for an addition to tax under section 6653(a) for 1988 and accuracy-related penalties under section 6662(a) for 1989 and 1990.

We find and hold that the value of the improved real property was $3,100,000, and that the value of the personal property was $96,000, for a total of $3,196,000 when the gift was made. We hold that petitioner Justin M. Jacobs, Jr. is not liable for the addition to tax and accuracy-related penalties for the years at issue.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

---

[3] Respondent conceded that petitioner Jane Crocker is not liable for the addition to tax and penalties for the taxable years at issue. The parties agree that petitioners are entitled to an investment interest carryover deduction from taxable year 1987 to taxable year 1988 and subsequent years in the total amount of $411,539.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first and second stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Atherton, California, when their petitions were filed.

I. Background

Petitioner Justin M. Jacobs, Jr. (Jacobs) is a real estate developer and licensed attorney. Since the late 1960's, Jacobs has primarily worked in the real estate development business, having stopped the active practice of law in 1970. Jacobs has principally built office buildings for the high-tech industry in the Silicon Valley and San Francisco Bay areas of California. As of the date of trial in these cases, Jacobs had constructed approximately 45 buildings.

Jacobs has also had an interest in historic buildings. Consistent with this, he has been involved in the restoration and subsequent sale of historic properties. Jacobs has renovated several houses in California, including a large Victorian-era house in Atherton, California, and a 33,000-square foot mansion situated on 6 acres in Hillsborough, California. He has also restored an 11th-century chateau located in Loiret, France, and a five-story townhouse on Sutton Square overlooking the East River in New York City.

Jacobs has also been involved in the antiques business. Sometime prior to May 1981, Jacobs decided to purchase a large

building to house his antiques business.  He looked at several buildings and eventually narrowed his choices to two properties, the Redwood City Fox Theater Building (the Redwood City Fox or the property) in Redwood City, California, and the Stanford Theater in Palo Alto, California.

In May 1981, Jacobs purchased the Redwood City Fox. He also purchased personal property associated with the theater.  He chose the Redwood City Fox over the Stanford Theater because the Redwood City Fox was in much better condition physically than the Stanford Theater.  Additionally, the Redwood City Fox building included commercial space, both retail and office, adjacent to the theater, which Jacobs wanted to utilize for his antiques business.  The purchase price for the Redwood City Fox and associated personal property was $1,000,000,[4] allocated $912,556 to the theater and commercial space and $87,444 to the personal property.[5]

---

[4] Jacobs believed he purchased the Redwood City Fox for a good price because the prior owners "didn't have the money or the desire or the knowledge * * * to fix it up, and they just wanted * * * get rid of it."  Jacobs considered the May 1981 sale of the Redwood City Fox to be a "distress sale".

[5] There is conflicting evidence in the record concerning the purchase price of the Redwood City Fox and the associated personal property.  Jacobs testified he paid "somewhere around $1,080,000."  An appraisal of the Redwood City Fox prepared by David Ingram Jr. and William J. Ewing at Jacob's request and dated April 1987 indicates that Jacobs paid $1,090,344 to acquire the property, allocated $399,146 to the land, $610,783 to the building, and $80,415 to the equipment.  The Ingram/Ewing appraisal report also states that Jacobs was the source of this
(continued...)

II. Description of the Redwood City Fox

The Redwood City Fox is a steel-reinforced concrete building that was constructed in 1928 and is comprised of a theater with adjacent commercial space. The Redwood City Fox is an example of an American "movie palace"--a distinct phase of theater architecture which occurred primarily between 1915 and 1945, with its peak period in the 1920's. The Redwood City Fox was built to serve both as a vaudeville house for live entertainment and as a "fantasy" movie palace. The inclusion of commercial space within the larger theater building is indicative of a trend during the 1920's and 1930's to use theaters to create more distinctive office and retail buildings.

The facade of the Redwood City Fox building is Gothic Revival with Art Deco themes, and is representative of the late 1920's. The theater incorporates many architectural features of that generation, including an ornate terrazzo sidewalk, a recessed entrance, an expansive "Grand Lobby", a high level of interior decoration, a pipe organ and organ lofts, and numerous

---

[5](...continued)
information. The May 1, 1981, Purchase Agreement executed by Jacobs and the sellers, Redwood Theatre, Ltd., indicates a purchase price of $1,000,000, with $87,444 of the purchase price allocated to the personal property and $912,556 allocated to the real property. Escrow instructions dated May 8, 1981, also indicate a sales price of $1,000,000, with an additional $16,675.36 paid by Jacobs for closing costs and prorated property taxes. Based on the evidence presented, we find that Jacobs paid $1,000,000 for the Redwood City Fox and associated personal property, exclusive of closing costs and property taxes.

design flourishes.  To accommodate live performances, the stage house of the theater is equipped with a fly loft, rigging, dressing rooms, and an orchestra pit.  For films, the theater has a projection booth and a sound system.

The Redwood City Fox Theater originally opened as the Sequoia Theater on January 5, 1929.  In October 1929, the property was bought by the Fox West Coast Theaters chain.  The theater operated until June 1950, when a portion of the auditorium's plaster ceiling collapsed.  The theater was closed by Fox West Coast Theaters for 3 months while an extensive renovation was completed.  The renovation involved the installation of a new ceiling in the auditorium with perimeter indirect lighting, the installation of new seating, the design and installation of a new acoustic system, as well as new restrooms in the main foyer.  The theater's interior, originally designed as an "atmospheric" Spanish courtyard, was redecorated in the Fox West Coast Theaters' "Skouras"[6] style.  Additionally, the Sequoia marquee and vertical signs were removed, and a new V-shaped marquee was installed, bearing the new "Fox" designation. The newly renamed Redwood City Fox Theater opened in September 1950.

The Redwood City Fox Theater continued to operate until the 1970's when, due to the decline of the downtown Redwood City

[6] So named after Charles Skouras, the then-president of Fox West Coast Theaters.

commercial district as well as the advent of large suburban multiscreen theaters, it lost its audience. In June 1976, the Redwood City Planning Department listed the Redwood City Fox as a key building in the Historic Resources Inventory of Redwood City. Despite its listing in the Historic Resources Inventory, the Redwood City Fox stage was rarely used throughout much of the 1970's,[7] though the retail/office spaces did have tenants.

After Jacobs' purchase and subsequent donation of the property, the City Council of Redwood City designated the Redwood City Fox an official historic landmark on July 27, 1987. In 1989, the City Center Action Committee of Redwood City was formed, which focused on the Redwood City Fox as one element in a plan for the revitalization of downtown Redwood City. In 1991, the City of Redwood City also established the Fox Theater Task Force (Task Force). The Task Force was organized to conduct activities that would benefit Redwood City through the preservation of the Redwood City Fox. The potential benefit of these activities was described in a Task Force Report as "the preservation of an historic building, assistance in the revitalization of Downtown [Redwood City] by increasing activity at the Fox and increasing the availability of cultural activities in the City." One of the activities of the Task Force was the

---

[7] Jacobs testified that prior to his purchase of the Redwood City Fox in May 1981, the then-owners of the property were "making almost no use of the theater" other than to show second-run and old films.

pursuit of national landmark status for the Redwood City Fox. This goal was achieved when the Redwood City Fox was awarded a listing in the National Register of Historic Places on May 5, 1994.[8]

The Redwood City Fox is located at 2215 Broadway in downtown Redwood City. The site area of the property has 100 feet of frontage along Broadway, and approximately 15 feet of frontage in the nature of access lanes on each of the other surrounding streets. The shape of the site is basically rectangular with the three, 15-foot wide access lanes extending from the main parcel, which is located in the center of the block, to the side and rear streets. The depth of the lot relative to Broadway is 243 feet. The 100-foot wide building facade is comprised of a 4-story building with an added 3-story plaster tower reaching approximately 63 feet above the street. The total site area is approximately 26,583 square feet.

For purposes of this opinion, the Redwood City Fox will be analyzed as two separate components: (1) The theater component,

---

[8] A letter from a representative of the National Park Service to the Mayor of the City of Redwood City described the Redwood City Fox as follows:

> The 1928 theater building is an excellent local example of Late Gothic Revival style design and reflects the romantic nature of small-town movie palace construction during the golden age of movies. Listing in the National Register recognizes the importance of the New Sequoia Theater Building to the rich cultural history of Redwood City.

which includes the lobby and auditorium; and (2) the retail/office component, which is in turn composed of (a) the West retail space, which includes the ground floor and mezzanine level;[9] (b) the East retail space, which includes the ground floor and mezzanine level; (c) the Second floor office space; and (d) the Third floor office space.[10]  The square footage of building areas, both gross and net rentable, is as follows:

| Area | Gross Sq. Ft. | Net Rentable Sq. Ft. |
|---|---|---|
| Theater | 24,358 | 24,358 |
| East retail: | | |
| Ground floor | 2,625 | 2,611 |
| Mezzanine | 2,625 | 2,475 |
| West retail: | | |
| Ground floor | 2,625 | 2,065[11] |
| Mezzanine | 2,625 | 2,174 |
| Second floor office | 6,090 | 6,090 |
| Third floor office | 876 | 876 |

---

[9] Logistically, the mezzanine levels can only be leased in conjunction with their respective first floor retail spaces.

[10] The appraisers refer to the different areas by a variety of designations.  For clarity, when discussing the experts' reports, we will refer to the different areas by the designations we have assigned.  We note, however, that our designation of the East retail and West retail spaces as "retail" spaces in no way implies that we find these areas to be suitable only for retail use to the exclusion of office use.

[11] The West retail space contains an entryway vestibule with both a staircase and an elevator which services the Second and Third floor office spaces.  The square footage of the entryway vestibule is not rentable with the West retail space, and is thus deducted from the gross square footage of the area.

A.  The Theater Component

The middle 30 feet of the Broadway frontage bears the theater marquee, which projects over the sidewalk, and the recessed theater entry.  A bank of 6 decorated wood entry doors is inset from the sidewalk approximately 29 feet.  The entry area has a decorative terrazzo floor and tiled walls.

The entrance of the theater leads to the main lobby, which has a ceiling height of approximately 30 feet.  Decorative features include mirrors, aluminum panels, murals, Art Deco chandeliers resembling plants, and gilt decorative work.  The risers of a double staircase lead to the second floor mezzanine lobby along either side of the main lobby.

At the rear of the main lobby is a concession area which features an attractive wood bar with a large mirror.  The bar is an Art Deco piece that was installed by Jacobs in the 1980's.  The main lobby also houses public restrooms and several small service and storage rooms.

The seating in the theater auditorium consists of a main floor, a mezzanine or lower balcony, and an upper balcony.  As originally designed, the theater contained 1,469 seats.  The 1950 renovation reduced the seating capacity to 1,325 seats to permit more space between the rows.  As of the date of the donation, the theater contained a total of 755 seats, 602 of which were located on the main level and 153 of which were located in the lower balcony level.  Most of the seats in the center section of the

main floor were replaced by Jacobs during his ownership of the Redwood City Fox.[12]  The balance of the seats were comprised of seats and components from the 1950 renovation.  At some point prior to the gift, Jacobs intended to reinstall 350 seats in the upper sections of the auditorium, as well as 24 seats behind the orchestra pit, for a total seating capacity of 1,130 seats. However, as of the date of trial, the additional seating was not installed, and there remained 755 seats in the auditorium.[13]

The theater auditorium is highly improved in terms of architectural detailing and artistic design.  The ceiling is approximately 40 feet high and arched.  The auditorium also contains an orchestra pit and organ lofts.  The walls on either side of the theater are improved with spun glass composition sound insulation panels on which large Art Deco murals are painted.

The stage house, with a ceiling height of approximately 60 feet, features a gridiron "fly" system which is suspended approximately 50 feet above the stage floor and supports a network of sheaves, cables and counter weights used to raise scenery, drapes, and curtains from the stage floor into the fly

---

[12] Jacobs installed 168 rocker-type theater chairs which he had purchased from the Orinda Theater.

[13] As of the date of trial, the 153 seats located in the mezzanine level had not been used for seating purposes.  The mezzanine level had been used by the charitable donee for the use and storage of stage lighting equipment.

loft under the gridiron.  The stage house floor is approximately 24 feet deep and 80 feet wide, with a proscenium width of 40 feet.  A small L-shaped basement is located under the stage.  As of the date of donation, the fly system and stage house were highly functional and in working condition.

At the rear of the stage house is a one-story concrete block annex which houses the dressing rooms and the greenroom.  This area includes restrooms and a large delivery door for dock-high loading.

As of the date of donation, the exterior of the Redwood City Fox was in good condition.  Over the course of its existence, the property had survived several earthquakes with no observable structural weakening.  The interior finishes were also in good condition and did not require additional restoration.

B.  Retail/Office Component

1.  East Retail Space

The East retail space has 35 feet of frontage on Broadway, east of the theater entrance.  The space is rectangular, with 8-foot glass windows in the front overlooking Broadway and a glass and aluminum entry door.  The mezzanine floor, which also has windows overlooking Broadway, is accessed from the ground floor by two staircases.  The ceiling height of the mezzanine floor is 7.3 feet, which is lower than normal.  The space has one restroom.  At the time of the donation, the East retail space was

in very good condition, but needed the installation of heating elements.

### 2. West Retail Space

The West retail space has 35 feet of frontage on Broadway, west of the theater entrance. The space contains an entryway vestibule facing Broadway, with an elevator and staircase, which serves the Second and Third floor office spaces. The West retail space, both the ground floor and the mezzanine floor, consists of two retail suites which form a "U" shape around the entryway vestibule for the Second and Third floor office spaces. The ground floor of the West retail space has two entrance doors onto Broadway, one at each end of the "U". The mezzanine floor has windows facing Broadway, as well as a reduced ceiling height of 7.3 feet. Each retail suite has one restroom. As of the date of donation, the West retail space was in very good condition.

### 3. Second Floor Office Space

The Second floor office is a "U"-shaped space, located directly above the East and West retail spaces, and excludes the area used by the vaulted ceiling of the theater lobby, which reaches to the roof of the building. The ceiling height is 9.8 feet, with skylights illuminating much of the space. The space has several chandeliers, and all outside walls have windows. The space contains 31 partitioned offices, separate restrooms for men and women, one handicapped-equipped restroom, and a storage room.

As of the date of donation, the Second floor office space was in very good condition.

### 4.  Third Floor Office Space

The Third floor office space has 30 feet of frontage on Broadway in the center of the parcel.  The area has 9-foot ceilings.  As of the date of donation, the Third floor office space was unfinished and accessible only from the roof.  Subsequent to the gift, Jacobs installed a spiral staircase from the Second floor office space and finished the Third floor area.  Jacobs intended to finish the Third floor office space prior to his donation of the property.

## III.  Location of the Redwood City Fox

Redwood City, California, was incorporated in 1867 and is the county seat of San Mateo County.  San Mateo County is one of the nine counties comprising what is commonly referred to as the "Bay Area" of San Francisco.  San Mateo County occupies most of the peninsula south of the city and county of San Francisco.  The counties of Santa Cruz and Santa Clara are adjacent to the south.

As of 1985, San Mateo County had a population of approximately 620,016, and was the 11th largest county in California.  The median household income in San Mateo County was $31,806 in 1980, which was the highest in the State of California.  As of 1986, San Mateo County's economy offered employment in construction, manufacturing, transportation, communications, retail and wholesale trades, financial services,

and government.  During the relevant period, two of the major growth areas affecting San Mateo County were high technology and office-oriented employment.  In the mid-1980's, land values in the area were escalating rapidly.

Redwood City is located in the southeasterly portion of San Mateo County, approximately 25 miles south of San Francisco and 25 miles north of San Jose.  Redwood City is bordered by the San Francisco Bay to the east, the city of Woodside to the west, the city of San Carlos to the north, and the cities of Menlo Park and Atherton to the south.  Its population in 1985 was estimated at 57,300 persons, making it the third largest city in San Mateo County.  Though primarily residential in nature, commercial and industrial uses exist, clustered mostly adjacent to Highway 101 in Redwood City's east end and emanating outward from Redwood City's downtown core.

The Redwood City Fox is located on Broadway, one of the main thoroughfares in downtown Redwood City.  The property is situated on the south side of Broadway, on a block bounded by Hamilton Street, Middlefield Road, and Winslow Street.  Across Broadway from the property is the old San Mateo County Courthouse, which dates from 1908.  As of the date of trial, the Redwood City Council was in the process of opening the San Mateo County Historical Museum in the old San Mateo County Courthouse.

The area surrounding the Redwood City Fox houses both the City of Redwood City and the County of San Mateo government

offices. The new San Mateo County Courthouse, as well as the balance of the County of San Mateo and City of Redwood City government offices, are located within two blocks of the Redwood City Fox.

In general, the improvements within the vicinity of the Redwood City Fox are dominated by older commercial structures which are small in scale, ranging from two to four stories. Many financial institutions and title companies have branches in the area. Additionally, the Caltrain commuter railroad station is within 1 block of the property.

The Redwood City Fox has two parking spaces on the west side of the building in one of the access lanes. There are two municipally owned public parking lots in the vicinity of the property, one across Winslow Street, behind the Redwood City Fox, and the other two blocks to the southeast, by City Hall. There is also metered street parking in the area around the property, which is free on weekday evenings and on weekends.

The Redwood City Fox is zoned CB, or Central Business. The purpose of the Central Business District is "to designate and promote the orderly development of the downtown business district as a central shopping facility for the whole city and surrounding area." Permitted uses include a variety of commercial and office uses, including retail, theater, and restaurant commercial uses, and professional and administrative office uses. Off-street parking requirements vary by use. The subject property is

considered a legal nonconforming use due to the lack of on-site parking.

A. Theater Market

As of the valuation date, there was a need for a large-capacity live performance theater in San Mateo County. The only other large live performance theater in the area was the San Mateo Performing Arts Center (SMPAC) at San Mateo High School, approximately 9 miles northwest of the Redwood City Fox. The SMPAC has a seating capacity of 1,605, and is the largest publicly owned theater facility in San Mateo County. It was considered the best large theater in the area for live stage performances and was tightly scheduled.

B. Commercial Market

Overall, the downtown commercial core of Redwood City has declined as a community shopping district, but has grown as a governmental and banking base. Office rental in downtown Redwood City is primarily based on a desire to be near the City of Redwood City and the County of San Mateo government offices. Similarly, the majority of the commercial users in downtown Redwood City cater to the City and County employees, the dominant workforce in the area. As a result, traffic along Broadway is diminished during the evenings and on weekends.

IV.  Jacobs' Use of the Property

From 1981 to 1986, Jacobs spent approximately $829,415[14] to restore and improve the Redwood City Fox.  The work performed included, among other things, an upgrade of the electrical system, including installation of a Dolby sound system and replacement of much of the stage lighting; the installation of stairs in, and the rehabilitation of, the plenum area of the auditorium; renovation of the restrooms in the public areas of the auditorium and the retail/office areas; repair of the roof; installation of new carpet, draperies, tile work, and painting; restoration of the wood and plaster parts of the theater; installation of new doors and door frames, including oak doors at the main theater entrance; installation of new theater seating; rehabilitation of the ceiling perimeter neon lighting system in the auditorium; and complete retrofitting of the dressing rooms. Additionally, the retail/office spaces were completely renovated, including installation of the mezzanines in both the West and East retail spaces.  Jacobs oversaw the renovation, putting in about 2,000 hours of his time, while the workers he hired performed about 60,000 hours of work.

---

[14] While the record is not clear as to the exact amount Jacobs spent to restore and renovate the Redwood City Fox, we are satisfied, and respondent agrees, that Jacobs spent at least $800,000 to restore the property.  We find that the most accurate figure is $829,415 based upon the evidence.

During his ownership of the Redwood City Fox, Jacobs showed classic films in the theater, as well as some live performances. He also attempted to operate the Redwood City Fox as a dinner theater. To this end, he installed an upscale French delicatessen in the West retail space, which was operated by his wife for 2 years.[15] He used the East retail space to house his antiques business and periodically held antique auctions. Additionally, Jacobs moved his real estate development business offices from nearby Sunnyvale, California, into offices he had constructed in the backstage area of the theater.

Jacobs also leased the Second floor office space to the County of San Mateo, commencing December 15, 1984. It was a 3-year lease, but was terminated on December 14, 1986, prior to the end of the lease term. The rent was $7,150 per month, with Jacobs paying all expenses. This rent equated to approximately $.90 to $1.00 per square foot.

By 1986, Jacobs was convinced that he could not operate the Redwood City Fox profitably. Jacobs believed he had the following alternatives with respect to the property: Raze the building and develop the site himself for the construction of an office building; sell the property to developers; or donate it to an organization which would preserve the property. Jacobs wanted

---

[15] After he closed the delicatessen, Jacobs renovated the West retail area and converted it back to commercial use.

to preserve the property, as he considered it an historic treasure. The Redwood City Fox had been placed on the Historic Resources Inventory of Redwood City in 1976, and, while not legally protected, he believed there would be a public outcry if he demolished the building.

Jacobs decided to donate the Redwood City Fox to an organization that would use the theater as a community resource and preserve it from demolition. After investigation, Jacobs selected the Palo Alto Players, Inc. (the Players), a California nonprofit corporation, to receive the Redwood City Fox as a gift. The Players is a community-based dramatic arts organization that qualified at all times relevant to these cases as a section 501(c)(3) exempt organization. The Players is based in Palo Alto, a community 10 miles to the south of Redwood City. At the time of the gift, Jacobs communicated his intention to place the Redwood City Fox on the local, State, and National Register of Historic Places.

The donation of the Redwood City Fox and associated personal property to the Players was accepted by the Players' Board of Directors on December 22, 1986, by corporate resolution. The gift was accomplished by an agreement (Agreement) executed by

Jacobs and the Players on December 29, 1986.[16]  The property

donated by Jacobs to the Players consisted of the following:

> Parcel of real property situated in the City of Redwood
> City, County of San Mateo, State of California, located
> at 2215 Broadway consisting of approximately 26,500
> square feet of land; together with all improvements,
> and furniture, fixtures and equipment constructed
> thereon or affixed thereto which are owned by Jacobs,
> including (without limitation) the Fox Theater
> consisting of approximately 24,000 square feet, and
> related office, retail and storage space consisting of
> an additional 13,000 square feet and all easements and
> other rights appurtenant thereto.

The Agreement contained the following use restrictions,

termed "covenants running with the land":

**Article 2**
**Restrictions**

2.1  Designation Of The Theater As An Historical
Landmark.  Jacobs intends to cause the Theater to be
designated as an historical site by the appropriate
authorities of the State of California and the United
States Government, and to be registered on the State of

---

[16] Jacobs and the Players also executed an "Assignment and
Assumption of Existing Leases" on Dec. 29, 1986, whereby Jacobs
assigned to the Players the following three leases recited in the
assignment:

> (1)  A lease entered into on September 24, 1985,
> between * * * [Jacobs] and Big Brothers/Big Sisters of
> the Peninsula, Inc. granting non-exclusive rights to
> use a portion of the Building for semi-weekly bingo
> games, which lease has no definite term;
> (2)  An oral lease entered into as of April 1,
> 1984, between * * * [Jacobs] and Bayshore Auction
> granting non-exclusive rights to use a portion of the
> Building for periodic auctions, with a percentage of
> revenue derived therefrom paid as rent, which lease has
> no definite term; and
> (3)  A lease between * * * [Jacobs] and Sonitrol
> of a portion of the Building dated March 1, 1979.

California Registry of Historical Sites and/or the National Registry of Historical Sites of the United States.  Players shall fully cooperate with Jacobs in such efforts, shall execute and deliver any documents reasonably requested by Jacobs in furtherence [sic] of the above, and shall use its good faith best efforts to cause such designation to occur.

2.2  Maintenance Of The Theater.  Players shall maintain the facade of the Theater in good condition and repair, and shall not take or allow any action which would compromise the architectural integrity of the art deco facade.

2.3  Use Of Premises.  Players shall use the Theater as the "Peninsula Center for the Performing Arts".  Players shall use the Theater only as a performance auditorium and shall not use the theater for sporting events or any use other than as an auditorium for the performing arts, or as provided in section 2.4 herein.

2.4  Availability Of The Theater For Other Civic Uses.  Players shall allow and shall have the right to allow other performing arts organizations, civic and community organizations, the City of Redwood City, and the County of San Mateo to use the Theater on a financial basis which is affordable to all parties involved, during times which do not unreasonably conflict with Players' use.  The Theater shall be made available to such other parties to the greatest extent possible which does not interfere with Players' use, but in no event less than ten percent (10%) of the hours that similar performance auditoriums are usually and customarily used.

2.5  Memorial Plaque.  Jacobs is donating the Theater to Players in the name and memory of his late father, Justin Manning Jacobs, Sr., and Jacobs will affix an appropriate bronze memorial plaque to the Theater at his sole cost.  Players shall maintain the plaque in good condition and repair in the location at which it was originally installed by Jacobs.

The gift deed transferring the property to the Players was recorded on December 31, 1986.

As part of the donation to the Players, Jacobs gifted items of personal property, described in the bill of sale executed on December 29, 1986, between Jacobs and the Players.  The items donated were in good condition and all were functional.  The fair market value of the personal property on the date of donation was $96,000.[17]

Contemporaneous with the gift of the property to the Players and pursuant to the December 29, 1986, Agreement, Jacobs leased from the Players approximately 12,268 square feet of the Redwood

---

[17] Jacobs estimated the fair market value of the personal property donated to the Players to be between $90,000 and $100,000.  Peter Morrison of Adamson Associates, Inc., a professional cost estimating firm retained by petitioners in 1986, listed the following items of personal property donated and their estimated values:

| | |
|---|---|
| Bingo equipment | $ 4,000 |
| Fox film library | 25,000 |
| Fireplace | 15,000 |
| Baldwin theater organ | 5,000 |
| Kitchen and deli equipment | 17,000 |
| Stacking chairs | 3,000 |
| Double-decker London bus | 21,000 |
| Safe | 1,000 |
| Piano | 1,000 |
| Total | $92,000 |

In their appraisal report, Ingram/Ewing stated that the correct figure for the safe was $5,000, rather than the $1,000 listed in the Adamson report.  In light of the $87,444 allocated to the personal property when Jacobs purchased the property in May 1981 and the fact that he subsequently purchased additional items which he donated to the Players, we are satisfied that the $96,000 figure is accurate.  Respondent makes no argument against this figure.  Accordingly, we find that, on the valuation date, the fair market value of the personal property donated by petitioners to the Players was $96,000.

City Fox's commercial space (the Jacobs lease). The Jacobs lease included the West retail space (ground floor and mezzanine), Second floor office space, and unfinished Third floor office space.[18] The lease was for an initial term of 5 years at a rate of $3,000 per month. The terms of the lease provided that Jacobs was obligated to pay all expenses associated with the leased portion of the premises, including all janitorial services, utilities, real property taxes allocable to leased portion of the premises, and comprehensive general liability insurance. Jacobs was also required to make all major repairs.

The Jacobs lease granted Jacobs ten separate options to extend the lease term for a period of 5 years for each option. Additionally, the lease granted Jacobs an option to repurchase the commercial portion of the property for $10,000 if the commercial portion of the property could be subdivided legally into condominiums.

Shortly after the gift to the Players, Jacobs determined that subdivision of the commercial portion of the property would not be commercially feasible. Consequently, Jacobs and the Players amended the lease on June 26, 1987. The amended lease rescinded Jacobs' right to subdivide the commercial space and his option to purchase after such subdivision. The amended lease

---

[18] As mentioned, Jacobs installed a staircase and finished the Third floor office space subsequent to his gift of the property.

provided it became effective as of December 29, 1986.  Jacobs executed a quitclaim deed on September 29, 1987, disclaiming the rights under the original lease.

After the donation of the Redwood City Fox, Jacobs negotiated, on behalf of the Players, a short-term lease between the Players and the County of San Mateo for the East retail space (including mezzanine), for the period of March 2, 1987, to December 1, 1987.[19]  Rent was $4,720 per month, with the County of San Mateo paying utility expenses, including gas, electrical, and janitorial services.  The Players were responsible for paying all real property taxes, structural repairs, and fire insurance.

By agreement dated December 23, 1992, Jacobs and the Players terminated the Jacobs lease.  At that time, Jacobs assigned two existing subleases he had negotiated to the Players.

V.  Players' Use of the Redwood City Fox

The Players have offered live theater productions at the Redwood City Fox from 1987 until the present.  Currently, the Players, operating as the "Peninsula Center Stage", mount 3 productions a year at the Redwood City Fox.  Each production runs for approximately 13 performances.  The Players use the West retail space as the box office for the Peninsula Center Stage. When not used by the Players, the theater is available for use by

---

[19] The lease agreement between the Players and the County of San Mateo states the leased premises consists of "approximately 4,000 square feet".

community organizations. The Players operate the Peninsula Center Stage with financial support from the City of Redwood City. The Players receive approximately $30,000 per year from the City of Redwood City.

In 1990 and 1991, the Players received from the City of Redwood City a grant to upgrade the water delivery system for the sprinkler system located over the stage area of the theater. Since 1986, the Players have spent less than $100,000 in repairs and renovations on the Redwood City Fox, primarily for the sprinkler system upgrade and the addition of new roofing over the theater.

Despite the lack of on-site parking, there was "ample" parking around the property, and parking for events at the Redwood City Fox has not been considered a problem.

VI. Petitioners' Valuation and Charitable Contribution Deductions

A. Ingram/Ewing Appraisal

In order to ascertain the amount of their charitable contribution deduction for their donation of the Redwood City Fox in taxable year 1986, petitioners retained David Ingram, Inc., a real estate appraisal firm located in Foster City, California, to prepare an appraisal of the Redwood City Fox. The appraisal of the property was performed by David Ingram, Jr. (Ingram)[20] and

_____

[20] David Ingram, Jr. died in November 1993. Consequently,
(continued...)

William J. Ewing (Ewing).  Ingram and Ewing prepared their report in early 1987 and delivered it to Jacobs in April 1987.  At the time they prepared their report, Ingram had been active in the field of real estate appraisal since 1946, and was a member of the American Society of Real Estate Counselors, the American Institute of Real Estate Appraisers, member and past-president of the Menlo Park-Atherton Board of Realtors, and member and past-director of the California Real Estate Association.  Ewing had worked as an independent appraiser since 1970 and was a candidate for membership with the American Institute of Real Estate Appraisers.  Ewing testified at trial regarding the Ingram/Ewing appraisal report.

Ingram/Ewing commenced their appraisal by breaking down the Redwood City Fox into four "appraisal units", which they valued separately.  The theater space was designated Unit A.  The East retail space, including the first floor and mezzanine, was designated Unit B.  The West retail space, including the first floor and mezzanine, was designated Unit C.  The Second and Third floor office spaces, including space from the West retail area for the elevator, staircase, and entryway vestibule, were designated Unit D.

---

[20](...continued)
William J. Ewing testified regarding the April 1987 appraisal of the Redwood City Fox.

Ingram/Ewing concluded that the highest and best use of the Redwood City Fox was its continued use as a performing arts center and as retail/office space. In addition to its historical significance, Ingram/Ewing based their highest and best use conclusion on the apparent market demand in the surrounding community and region for a performing arts center with a large seating capacity, such as the Redwood City Fox. Ingram/Ewing estimated 1,130 seats to be the appropriate seating capacity of the Redwood City Fox, and used this number of seats in their valuation analysis.

Ingram/Ewing determined that the highest and best use of the commercial space would be for use as office space. Should the East and West retail spaces be leased for retail use, Ingram/Ewing determined that the spaces would return one-half to two-thirds of the rent that would be probable with office use.

In appraising the value of the Redwood City Fox as of December 31, 1986, Ingram/Ewing concluded that because the theater portion of the Redwood City Fox was special use property, the replacement cost method should be relied upon to estimate value. However, because of the recent sale of the San Jose Fox Theater (San Jose Fox), another Fox movie palace located near the Redwood City Fox and sold close in time to the valuation date,

Ingram/Ewing also employed the comparable sales[21] method to value the theater portion of the Redwood City Fox.  Recognizing that the theater would be run by a non-profit group and that there were no income comparison data available, Ingram/Ewing did not employ the income capitalization approach to value the theater portion of the Redwood City Fox.

With respect to valuing the commercial portion of the Redwood City Fox, Ingram/Ewing employed the replacement cost approach and the market approach.  Ingram/Ewing did not utilize the income capitalization method for the retail/office component, and they did not provide any reason for not employing this method.  Ingram/Ewing also did not consider the impact of the Jacobs lease on the value of the retail/office portion of the property.

### 1.  Adamson Cost Estimate

To perform their appraisal, Ingram/Ewing required Jacobs to retain a professional cost estimator to do a cost analysis of the property.  In December 1986, Adamson Associates, a construction cost planning and management firm located in San Francisco, California, prepared a detailed report for petitioners estimating the probable cost to construct a new building matching, in plan

---

[21] In their appraisal report, Ingram/Ewing refer to the comparable sales method as the market data method.  For clarity, we shall refer to this method as the comparable sales method.

and construction style, the Redwood City Fox.  The materials and construction methods would match the existing materials and methods, except where new materials could mimic the existing materials at a lower cost.  Historical features were replaced with new equivalents, not replicated.  The artwork (mainly painted murals) was not replaced.  No allowance was made in the Adamson report for the historical value of any item in the Redwood City Fox, nor was allowance made for depreciation of the property.  In summary, the replacement building estimated in the Adamson report would be completely new, with finishes and fixtures of similar style and character to the existing property, would be functionally identical to the existing Redwood City Fox, but would have no historical value.

The Adamson estimate was based on the total direct construction costs of 16 components: (1) Foundations; (2) vertical structural members; (3) floors and roofs; (4) exterior cladding; (5) roofing and waterproofing; (6) interior partitions; (7) floor, wall and ceiling finishes; (8) building function/specialties and equipment;[22] (9) vertical transportation; (10) plumbing; (11) heating, ventilating, and air conditioning; (12) electrical; (13) fire protection; (14) site preparation; (15) site development; and (16) utilities.  Added to

---

[22] Under the component "8. Specialties and Equipment" for the theater, a quantity of 760 seats at a cost of $350.00 per seat was used to calculate the cost of seating.

these total direct construction costs were 7 percent for "General Conditions" and 5 percent for "Overhead and Profit". The Adamson report estimated the probable replacement cost of the Redwood City Fox to be $7,016,000, broken down as follows:

|  | Square Feet | Price per Square Foot | Total Cost |
|---|---|---|---|
| Theater | 24,430 | $222.06 | $5,425,000 |
| Second Level Office | 6,892 | 132.33 | 912,000 |
| East Retail | 5,550 | 61.62 | 342,000 |
| West Retail | 4,940 | 68.22 | 337,000 |
| Total |  |  | $7,016,000 |

The Adamson estimate did not include the cost of demolishing the existing structure, nor did it include the cost of any improvements to the building, such as increasing seismic performance or improving accessibility. Also excluded from the Adamson cost estimate were legal and financing costs, fire and all risk insurance costs, building permits, utility connections and fees, and fees for professional design, testing, inspection, and management.

### 2. Replacement Cost Approach

Under the replacement cost approach, Ingram/Ewing first valued the land utilizing comparable sales. Ingram/Ewing viewed 6 sales of commercially zoned vacant land in Redwood City as comparables. Ingram/Ewing made adjustments to the sale prices for factors such as location, size, time of sale, and potential use. Ingram/Ewing valued the land, as if vacant, at $27.00 per square foot, or $720,000 rounded (26,583 square feet x $27.00 per square foot = $717,741). Ingram/Ewing assigned 20,089 square

feet to the theater, for a land value estimate of $542,403, and they assigned 6,493 square feet to the retail space, for a land value estimate of $175,311.

Ingram/Ewing then utilized the cost estimate in the Adamson report to value the improvements. For the theater portion, Unit A, Ingram/Ewing made the following adjustments to the $5,425,000 figure estimated in the Adamson report. First, Ingram/Ewing determined that optimum seating for the theater would be 1,130 seats. Consequently, they recommended the addition of 370 seats to the 760 seats used in the Adamson report. At a cost of $350 per seat, Ingram/Ewing made an upward adjustment of $129,500 (370 seats x $350/seat = $129,500) for additional seating.

Next, under component number 8, "Specialities and Equipment", the Adamson report had listed the cost of items that Ingram/Ewing considered to be "personal goods" which should not be part of the real estate appraisal. They thus deducted the cost of these items and made a downward adjustment of $69,000. Ingram/Ewing next made an upward adjustment of $4,000, to reflect the $5,000 cost of a floor safe, rather than the incorrect cost of $1,000 used in the Adamson estimate.

In conclusion, with respect to the replacement cost of $5,425,000 estimated in the Adamson report for the theater, Ingram/Ewing added $129,500 and $4,000 for a total of $133,500,

from which they deducted $69,000, for a net addition of $64,500. To this figure, they added 7 percent for General Conditions and 5 percent for Profit, for a total upward adjustment of $72,240 to the $5,425,000 estimate in the Adamson report, for a total replacement cost estimate of $5,497,240 for theater portion, Unit A, of the Redwood City Fox.

Ingram/Ewing next estimated the "Projected Restoration and Deferred Maintenance Cost" of repairing/restoring the Redwood City Fox to a condition they term "Market Condition". Ingram/Ewing explained their methodology as follows:

> Appraisal of this property employs the Cost Approach which is calculated by estimating the replacement cost less depreciation, added to the estimated land value. Since this property is in the process of being restored, it is appropriate to project the costs of restoration or rehabilitation to bring it to the condition that it may be offered at market rent or market sale for it[s] highest-and-best use, which we will call "Market Condition". These projected costs are then deducted as capital expenses from the estimated market value of the property as if the property was completely rehabilitated and ready for market. The projected costs are estimated separately for each of the four unit spaces * * * .

Ingram/Ewing estimated the cost of "restoration and maintenance" for the theater portion to be $1,222,045. They estimated the cost of "restoration and maintenance" for the retail/office portions, Units B, C, and D, to be $55,295.

Ingram/Ewing next estimated accrued depreciation, both physical deterioration and functional obsolescence, for the Redwood City Fox. On the valuation date of December 31, 1986,

the Redwood City Fox was 58 years old.  However, rather than

estimating accrued depreciation for the Redwood City Fox as it

existed on December 31, 1986, Ingram/Ewing estimated depreciation

for the Redwood City Fox as if the projected maintenance and

restoration work discussed above had already been completed.

They thus concluded that both the theater and the retail/office

components of the property had an "effective age" which was less

than the Redwood City Fox's actual age.  To explain their reason

for estimating depreciation in this manner, with respect to the

theater portion, Ingram/Ewing listed 4 theaters that ranged in

age from 79 to 131 years old, and explained:

> These theaters are from 79 to 131 years old and still
> remain in good to excellent condition and are in
> current use, a characteristic that is specific to
> performing arts theaters.  For this reason it is
> difficult to predict depreciation or remaining life.
> This RCFox Theatre is in good condition and with the
> projected restoration is expected to be brought to
> "market condition" as previously discussed which is
> projected to be excellent condition.  Therefore, in
> considering these facts and relying on Marshall
> Valuation Service, together with appraisal experience,
> it is concluded that based on 45 years life expectancy,
> the subject theater has an effective age of 18 years
> and based on the Marshall Depreciation Table for
> Commercial Properties, is 19 percent depreciated.  This
> amounts to $1,044,475 depreciation leaving Net
> Depreciated Value of Improvements of $4,995,168.

Utilizing the same methodology with respect to the retail/

office space, Ingram/Ewing estimated depreciation as follows:

> Marshall Valuation Service has a guideline of typical
> building lives of 50 years for class C average offices.
> Therefore, we must consider that this office space is
> an integral part of the theatre space in coexisting for

the life of the property. The office space has already been restored, except for the Fourth Floor where tenant finish is needed, some minor deferred maintenance yet to complete. This office space is in very good to excellent condition having been renovated to the extent of refinishing most surfaces and installing new restrooms. In consideration of these facts and experience in appraising commercial properties it is concluded that the effective age is 18 years, resulting in a depreciation estimate of 15 percent. * * *

Ingram/Ewing estimated depreciation for the retail/office space to be $238,650.

Ingram/Ewing estimated a value of $3,773,123 under the replacement cost approach for the theater space, computed as follows:[23]

### Cost Approach Analysis for Theater Use Space

| | |
|---|---|
| Estimated Replacement Cost, As completed with 1,130 seats, for 24,358 square feet at $226 per square foot | $5,497,240 |
| Less Provision for Depreciation at 19%[1] (Utilizing Marshall Valuation Service and computed after restoration) | 1,044,475 |
| Net Depreciated Value of Improvements | 4,452,765 |
| Add Land Value Estimate | 542,403 |
| Total Estimated Value by the Cost Approach After Provision for Depreciation As Completed with Planned Restoration | 4,995,168 |
| Less Estimated Cost of Restoration and Maintenance | 1,222,045 |

---

[23] In the various tables produced by the experts and reproduced in our opinion, several of the experts' dollar totals do not appear to be correct. However, the dollar figures appearing in the experts' tables and reproduced in our opinion were rounded by the experts to what they considered the nearest dollar amount. We note that the dollar totals presented are in fact correct when the unrounded figures are considered.

Estimated Value by the Cost Approach             $3,773,123[2]
  After Deduction for Cost of Restoration

[1] Ingram/Ewing considered the theater space to be in "good condition", and that, after the planned restoration, it would be in "excellent condition". Thus, relying on the condition of other operating historic theaters, the Marshall Valuation Service, and their own judgement, Ingram/Ewing concluded that the theater has an effective age of 18 years, which results in 19-percent depreciation.

[2] In their appraisal report in a table titled "Summary of Values", Ingram/Ewing state that the value estimate under the replacement cost approach for the theater is $3,776,390.  No explanation is given to account for the difference between this figure and the $3,773,123 figure calculated above. Consequently, we use the $3,773,123 figure.

Under the replacement cost approach, Ingram/Ewing valued

the retail/office space at $1,472,366, computed as follows:

### Cost Approach for Retail/Office Space

Estimated Actual Gross Floor Area              17,518 square feet

Estimated Replacement Cost                     $1,591,000

Less Provision for Depreciation at 15%[1]          238,650
  (Utilizing Marshall Valuation Service and
   computed after restoration)

Net Depreciated Value of Improvements           1,352,350

Add Estimated Land Value at                       175,311
  $27 per square foot

Total Estimated Value by Cost Approach          1,527,661
  After Provision for Depreciation as
  Completed with Planned Restoration

Less Estimated Restoration and                     55,295
  Maintenance Cost

Estimated Value by Cost Approach After         $1,472,366
  Deduction for Cost of Restoration

[1] Ingram/Ewing considered the retail/office space to be in "very good to excellent condition" and thus concluded that the effective age of the retail/office improvements on the valuation date was 18 years, which resulted in a depreciation estimate of 15 percent based on the Marshall Valuation Service.

Thus, under the replacement cost method, Ingram/Ewing valued

the Redwood City Fox at $5,245,489.

3. Comparable Sales Approach--Theater Component

Ingram/Ewing based their comparable sales approach on the sale of the San Jose Fox Theater (San Jose Fox), which occurred in September 1985. The San Jose Fox is located at 345 South First Street in downtown San Jose, California, a city located approximately 25 miles south of Redwood City in Silicon Valley. The population of San Jose was in excess of 700,000 people in 1985.

The San Jose Fox opened in April 1927. It is also a movie palace, providing both live performance and motion picture capabilities, and was the first Fox movie palace in Northern California. The theater has an art deco facade and Spanish Baroque architecture, and is similar to the Redwood City Fox theater in configuration, as well as in both grandeur and historical appeal. The site area of the San Jose Fox is approximately 20,200 square feet, and the building area of the theater totals about 24,363 square feet. It was originally designed to have a seating capacity of 2,000 seats. Similar to the Redwood City Fox, the San Jose Fox was listed on the Historic Resources Inventories of both the City of San Jose and the County of Santa Clara, and was eligible for listing with the National Register of Historic Places.

The San Jose Fox operated continuously from 1927 to 1955, and operated intermittently until 1974, at which time it was

finally closed. In 1975, the San Jose Fox was purchased by Dr. Jose Borges for $300,000. Dr. Borges wished to preserve the historic splendor of the theater and to reopen it for use as a movie theater. Consistent with this, Dr. Borges spent approximately $700,000 for artistic restoration of the ceiling and walls of the auditorium. The seating and all carpeting were removed. However, Dr. Borges never reopened the San Jose Fox for business.

In September 1985, the Redevelopment Agency of the City of San Jose (Redevelopment Agency) purchased the San Jose Fox from Dr. Borges for $2,010,000 in cash. The Redevelopment Agency planned to revitalize downtown San Jose which, at that time, was rather seedy. At the time of its purchase by the Redevelopment Agency, the San Jose Fox had been dark since 1974 and was not in operating condition. There were neither seats nor carpeting in the theater, and the entire theater needed cleaning, refinishing, and restoration. Additionally, the San Jose Fox was without a ticket sales office, concession or food service areas, and public restrooms to serve the ground floor seating area. The balcony restrooms needed expansion, and there was no handicapped access. The theater required, among other things, upgraded plumbing, electrical (including lighting) and HVAC systems, a new audio system, and seismic reinforcement.

In 1985, the Redevelopment Agency commissioned Design Professionals, Inc. (Design Professionals), an architectural firm, to develop cost estimates for renovation of the San Jose Fox to bring it to an operating level of quality. In their report, entitled "Preliminary Analysis for Renovation of the Fox Theater for the City of San Jose, August 1, 1985", Design Professionals presented three alternative schemes of development based on variations in the level of projected use for the San Jose Fox. Each of the 3 schemes was analyzed in terms of architectural, structural, mechanical, electrical, lighting, theater systems, acoustical, and audiovisual requirements, including cost estimates for implementation. Design Professionals relied on cost estimates provided by several consultants with the requisite expertise.

Scheme 1 consisted of cost estimates to renovate the San Jose Fox for use as an assembly hall in conjunction with the new convention center being built across the street from the theater. A new 2-story lobby with a pedestrian bridge to connect the San Jose Fox to the convention center was recommended. Scheme 2 consisted of the improvements recommended in Scheme 1, as well as developing the theater for use as a symphony hall. Scheme 3 proposed to transform the San Jose Fox into a multifunctional facility with capabilities for opera, ballet, and other types of live performances. Scheme 3 required the construction of added

floor space for a loading area, offices, new dressing rooms, stage storage, and a truck dock.

In their appraisal report, Ingram/Ewing used the costs estimates provided by Design Professionals for each of the proposed improvement schemes for what they termed a "market comparison" of the Redwood City Fox to the San Jose Fox. First, Ingram/Ewing concluded that the Scheme 2 level of use of the San Jose Fox was very similar to the existing level of use of the Redwood City Fox if the proposed lobby/pedestrian walkway addition to the San Jose Fox were ignored. The Scheme 2 cost to bring the San Jose Fox to operating condition, minus $952,000 for the cost of the lobby addition, was $4,762,500. With 1,538 planned seats, the Scheme 2 estimated construction cost of rehabilitation for the San Jose Fox was $3,097 per seat. Ingram/Ewing then adjusted the Scheme 2 cost estimate by adding $162,000 for the cost of restrooms and $60,000 for the cost of stage lighting, and deducting $350,000 (one-half the amount spent by Dr. Borges) for what Ingram/Ewing considered the superior artistic decoration of the San Jose Fox. To this total was added the original $2,010,000 purchase price of the San Jose Fox. Ingram/Ewing next deducted the $1,222,045 they estimated to be the restoration cost of the Redwood City Fox. They then added a time adjustment of 4 percent per annum for the 1.3 years between the sales dates. Ingram/Ewing thus concluded that the "Market

Approach Value Estimate" for the Redwood City Fox, as of December 31, 1986, was $3,850,115, computed as follows:

```
Purchase Price of SJFox                                    $2,010,000
  Purchase Price per seat for 1,538 seats                     $1,307

Estimated Restoration and
  Rehabilitation Cost for Scheme
  2 without Mkt. St. Lobby         $4,762,500
  Cost per seat for 1,538 seats       $3,097

Adjustments for Comparison:
  Add stage lighting                  60,000
  Add restrooms                      162,000
  Deduct Architectural Decorat.     -350,000
  Total Net Adjustment              -128,000

  Estimated Cost Less Adjustment   4,634,500
  Value per seat for 1,538 seats       3,013
  Add purchase price per seat          1,307
  Total Est. Cost per seat SJFox       4,320

Estimated Value by Comparison for
  RC Fox Theatre Use Space
  for 1,130 seats at $4,320 each                             4,881,850

Less Estimated Cost to Restore                               1,222,045
Estimated Net Value Before Restoration                       3,659,805

Time Adjustment from September 12, 1985
  to December 30, 1986 at Annual     4.00%
  474 days/365 days = 1.30 years      1.30          $3,850,115
```

### 4.  Comparable Sales Approach--Retail/Office Component

Under the comparable sales approach for the retail/office space, Ingram/Ewing chose sales of 5 improved properties, all office buildings.  The unit of comparison was the price paid per square foot of gross functional building area, including land.  Ingram/Ewing made adjustments for such factors as location, age and condition of improvements, size, and date of sale.  Under the comparable sales approach, and after subtracting the estimated cost of restoring the retail/office space, Ingram/Ewing estimated

the value of the retail/office spaces to be $1,448,419, broken down as follows:

|  | Price Per Square Foot | Total Square Feet | Total |
|---|---|---|---|
| East Side Retail/Office Space (without mezzanine) | $103.00 | 2,625 | $ 270,375 |
| West Side Retail/Office Space (without mezzanine) | 103.00 | 2,105 | 216,815 |
| East Side Mezzanine | 65.92 | 2,625 | 173,040 |
| West Side Mezzanine | 65.92 | 2,226 | 146,738 |
| Office Space (without Fourth Floor) | 103.00 | 6,090 | 627,270 |
| Fourth Floor | 79.31 | 876 | 69,476 |
|  |  | 16,547 | $1,503,713 |
| Less Estimated Cost of Restoration |  |  | (55,295) |
| Total Market Value Estimate |  |  | $1,448,419 |

### 5. Ingram/Ewing--Value Reconciliation

In summary, Ingram/Ewing estimated the following values for the Redwood City Fox under their application of the replacement cost approach and the comparable sales approach:

|  | Cost | Market | Final Estimate |
|---|---|---|---|
| Theater | $3,776,390 | $3,850,115 | $3,850,000 |
| Retail/Office | 1,472,366 | 1,448,419 | 1,448,000 |
| Total |  |  | $5,299,000 |

Ingram/Ewing rounded this figure to arrive at $5,300,000 as their estimate of the fair market value of the Redwood City Fox as of December 31, 1986.

### B. Petitioners' Charitable Contribution Deduction

Petitioners used the services of an accountant to prepare their 1986 Federal income tax return. Based on the Ingram/Ewing

appraisal, petitioners claimed a charitable contribution deduction for the donation of the Redwood City Fox on their 1986 Federal income tax return in the amount of $5,300,000. Petitioners attached the Ingram/Ewing appraisal and a completed Form 8283 to their 1986 return.  Petitioners claimed carryover deductions of the remaining amount on petitioners' joint returns for 1988 and 1989, Jacob's return for 1990, and Crocker's returns for 1990 and 1991.

In the notices of deficiency, respondent determined that the fair market value of the Redwood City Fox on the date of the transfer to the Players was $1,290,000, rather than $5,300,000 as reported by petitioners on their 1986 Federal income tax return. Respondent's valuation was based on an appraisal performed by Mansbach Associates, Inc., for respondent in 1994.  Respondent also determined that Crocker was liable for an addition to tax under section 6653(a) for taxable year 1988 and accuracy-related penalties under section 6662(a) for taxable years 1989, 1990, and 1991, and that Jacobs was liable for an addition to tax under section 6653(a) for taxable year 1988 and accuracy-related penalties under section 6662(a) for taxable years 1989 and 1990.

Respondent concedes that Crocker is not liable for the addition to tax under section 6653(a) for taxable year 1988 and the accuracy-related penalties under section 6662(a) for taxable years 1989, 1990, and 1991.

VII.  The Expert Reports

To establish the fair market value of the Redwood City Fox and associated personal property, each party offered the report and testimony of an expert witness:  William J. Ewing and Anthony Reynolds for Jacobs, Christopher Carneghi for Crocker, and Lawrence Mansbach for respondent.  The parties and their experts rely extensively on the Ingram/Ewing appraisal for facts about the Redwood City Fox, including its history, physical dimensions, and use and condition in 1986, as well as for facts about movie palaces in general and other theaters in the area.  Much of the comparable sales data presented in the Ingram/Ewing appraisal is used by the parties' experts in their estimates of fair market value.

A.  Jacobs' Expert

Because of Ingram's death in 1993, Jacobs engaged the firm of Mitten & Reynolds, Inc., a real estate appraisal firm located in Washington, D.C., to prepare an appraisal of the Redwood City Fox.  The Mitten/Reynolds report was prepared by Anthony Reynolds (Reynolds) and Carol Mitten (Mitten) in February and March 1996 and delivered to Jacobs in April 1996.  Both Reynolds and Mitten are members of the Appraisal Institute, and both have considerable experience in valuing historic properties such as the Redwood City Fox.  Reynolds testified at trial as Jacobs' expert.  Reynolds had not appraised any properties in California prior to his appraisal of the Redwood City Fox.

Mitten/Reynolds determined that preservation was the highest and best use of the Redwood City Fox. They based this determination on the property's character and its use as an operating theater and related commercial space, which they found to be consistent with its zoning and location on Broadway. They also acknowledged the quality of the Redwood City Fox as an example of an early movie palace and as an example of Gothic Revival architecture.[24]

Mitten/Reynolds valued the theater component of the Redwood City Fox separately from the retail/office component. For the theater, Mitten/Reynolds relied upon the replacement cost and the comparable sales approaches. Because they concluded that the highest and best use of the Redwood City Fox was preservation, Mitten/Reynolds found that the value of the theater was not determined by its income potential and that consequently the income capitalization method was inappropriate for the theater.

For the retail/office space, Mitten/Reynolds relied upon the replacement cost approach, the comparable sales approach, and the income capitalization approach. Mitten/Reynolds considered the impact of the Jacobs' lease on the property's value in their report.

---

[24] Highest and best use considerations for historic properties, according to Mitten/Reynolds, include "the degree of historical significance, the physical integrity of the structure, the level of deterioration and obsolescence, and the physical and economic environment in which the property is located."

### 1. Replacement Cost Approach--Theater

Under the replacement cost method, Mitten/Reynolds estimated the value of the underlying land to be $770,000 (rounded), using seven sales of commercially zoned vacant[25] land as comparables ($29.00 per square foot times 26,583 square feet). Mitten/Reynolds made adjustments to the sales prices for financing, date of sale, location, block orientation, configuration, size, existing improvements, and buyer motivation. Mitten/Reynolds allocated 15,929 square feet of land area to the theater, for a land value of $461,000, and 10,654 square feet of land area to the retail/office component, for a land value of $309,000.

For the replacement cost of the theater, Mitten/Reynolds used the cost estimate in the Adamson report, which they adjusted by: (1) Subtracting $92,000 for the personal property donated to the Players; (2) adding the costs of nonconstruction items (design costs, permits and fees, financing cost, etc.); and (3) adding an entrepreneurial fee of 10 percent. Mitten/Reynolds estimated the total replacement cost of the theater, excluding the land, to be $7,000,862, computed as follows:

| | |
|---|---|
| Total Direct Construction Cost | $4,829,000 |
| Deduction for Non-Operating Personalty | 92,000 |
| Adjusted Direct Construction Cost | 4,737,000 |
| General Conditions (7%) | 331,590 |

---

[25] Mitten/Reynolds' Comparable #4 was sold with an existing improvement, which was subsequently demolished by the purchaser. Consequently, Mitten/Reynolds made an upward adjustment of the sales price.

```
Contractor's Overhead and Profit (5%)        236,850

Adjusted Total Construction Cost           5,305,440

Non-Construction Items
  Design                                     530,000
  Permits, Fees, Taxes, Insurance, Etc.      200,000
  Occupancy                                        0
  Financing                                  328,980

Out-of-Pocket Replacement Cost             6,364,420

Entrepreneurial Incentive (10%)              636,442

Total Replacement Cost (Excluding Land)   $7,000,862
```

Mitten/Reynolds then estimated total depreciation, both physical and functional,[26] to be 55 percent of the $7,000,862 replacement cost, or $3,850,474.  Mitten/Reynolds estimated the value of the theater component under the replacement cost method as follows:

```
Total Replacement Cost          $7,000,862
Depreciation (55%)               3,850,474
Depreciated Replacement Cost    $3,150,388
Land Value Allocation              461,000

Value Indication                $3,611,388
```

Mitten/Reynolds concluded that the value of the theater component of the Redwood City Fox, indicated by the replacement cost approach, was $3,600,000 (rounded), for a value of $147.80 per square foot ($3,600,000 divided by 24,358 square feet of building area).

---

[26] Mitten/Reynolds cited issues relating to seating, toilet facilities, air-conditioning, the age of the structure, and its systems and surfaces as elements of depreciation that affected their appraisal of the property.

## 2. Comparable Sales--Theater

Under the comparable sales approach, Mitten/Reynolds chose the sale of the San Jose Fox and the sale of the Stanford Theater (the Stanford) in Palo Alto, California, as comparables. As mentioned, the San Jose Fox is another historic movie palace that was purchased by the City of San Jose in September 1985.

The Stanford was sold to the nonprofit David and Lucille Packard Foundation (Packard Foundation) in December 1987 for $1,600,000 in an all cash transaction. The Stanford is located on University Avenue near the campus of Stanford University in Palo Alto, an affluent community approximately 30 miles south of Redwood City.

The Stanford was built in 1925 and is similar in size and attractiveness to both the Redwood City Fox and the San Jose Fox, although less ornate than the Fox theaters. Unlike the Redwood City Fox and the San Jose Fox, the Stanford was designed for movie projection only; there are no stage facilities to accommodate live performances. The Stanford has 22,313 square feet of building space with a post-renovation seating capacity of 1,175. The precise seating capacity prior to its sale is unknown, but, due to different seating standards, was probably greater.

At the time of its purchase, the Stanford was in extremely poor condition and void of any decorative work. Due to its physical condition, the Packard Foundation undertook a complete

rehabilitation of the Stanford. The rehabilitation included seismic reinforcement, all new plumbing, and mechanical and electrical improvements, as well as historically accurate restoration of all areas of the building, including the facade, restrooms, auditorium, balconies, floor coverings, concession stand, and ticket booth. The building was gutted, a new roof was constructed, and the foundation was reinforced. The renovation cost $6,000,000, and took 18 months to complete. The renovated Stanford reopened in December 1989 and is operated by the Packard Foundation for the exhibition of classic films.

Mitten/Reynolds also mentioned the sale of the Redwood City Fox to Jacobs in May 1981. However, Mitten/Reynolds concluded that due to the lapse of time between the acquisition date and the appraisal date, as well as the refurbishment performed by Jacobs, the sale of the Redwood City Fox in May 1981 neither supported nor refuted their appraisal opinion.

The unit of comparison employed by Mitten/Reynolds was the price paid per square foot of gross building area, including land. Mitten/Reynolds did not believe that the price paid per seat was a proper unit of comparison because the number of seats in a theater is not fixed.

Mitten/Reynolds compared the theater sales on the basis of seller financing, date of sale, size, physical condition, physical/historical quality, and location. After adjustment, Mitten/Reynolds concluded that the value of the theater portion

of the Redwood City Fox indicated by the comparable sales approach was $135.00 per gross square foot, for a total of $3,288,330, which they rounded to $3,300,000 (24,358 square feet times $135.00 per square foot).

### 3. Replacement Cost Approach--Retail/Office

Under the replacement cost approach for the retail/office space, Mitten/Reynolds started with the cost estimate contained in the Adamson report, which they adjusted by adding non-construction costs and an entrepreneurial incentive. Based on their determination that the physical condition of the retail/office space was "very good", Mitten and Reynold estimated all forms of depreciation to amount to 25 percent of the total replacement cost. Under the replacement cost approach, Mitten/Reynolds valued the retail/office space at $1,800,000 (rounded), computed as follows:

| | |
|---|---|
| Total Construction Cost | $1,587,040 |
| Non-Construction Items | |
| Design | 111,093 |
| Permits, etc. | 50,000 |
| Occupancy | 40,000 |
| Financing | 106,199 |
| Out of Pocket Replacement Cost | 1,894,332 |
| Entrepreneurial Incentive (5%) | 94,717 |
| Total Replacement Cost | 1,989,049 |
| Depreciation (25%) | 497,262 |
| Depreciated Replacement Cost | 1,491,787 |
| Land Value Allocation | 309,000 |
| Value | $1,800,787 |

### 4. Comparable Sales--Retail/Office

Under the comparable sales approach, Mitten/Reynolds chose the sales of 6 small commercial properties located in the

vicinity of the Redwood City Fox.  All the sales, except for one, occurred prior to the valuation date of December 31, 1986.  The selected unit of comparison was price paid per square foot of gross building area.  The elements of comparison included seller financing, date of sale, building size, physical condition, parking, and location.  After adjustment, Mitten/Reynolds concluded that the value for the retail/office component of the Redwood City Fox was $110.00 per gross square foot, for an indicated value under the comparable sales approach of $2,000,000, rounded (18,489 square feet times $110.00 per square foot).

In summary, under the comparable sales approach, Mitten/Reynolds concluded that the value of the Redwood City Fox was $3,300,000 for the theater, $2,000,000, for the retail/office, for a total of $5,300,000.

### 5.   Income Capitalization--Retail/Office

Mitten/Reynolds concluded that the income capitalization method was not appropriate for the theater.

With respect to the retail/office space, Mitten/Reynolds examined the lease rates for 8 properties (lease comparables). Seven of the lease comparables were rented on a fully serviced[27] basis, while only one was on an unserviced basis.  Consequently, Mitten/Reynolds estimated the market rent of the Redwood City Fox

---

[27] "Fully serviced", in the context of commercial leases, is one in which the landlord pays all operating expenses.

on a fully serviced basis.  Full service operating expenses were estimated at a rate of $.30 per square foot per month.  Due to its lower ceiling height and because it would have to be rented in conjunction with the ground floor retail space, Mitten/Reynolds concluded that the mezzanine space would command less rent.  Mitten/Reynolds estimated the market rental rates for the different areas of the retail/office portion of the property as follows:

| | |
|---|---|
| 3rd Floor | $1.35 |
| 2nd Floor | $1.35 |
| Mezzanine | $1.00 |
| 1st Floor | $1.35 |

Mitten/Reynolds did not consider the lease of the property in 1984 by the County of San Mateo in their analysis.  Though not entirely clear from the record, it does not appear that Mitten/Reynolds considered the lease of the property by the County of San Mateo in 1987 either.

Mitten/Reynolds estimated the net operating income for the retail/office space[28] as follows:

Income per Month
| | | |
|---|---|---|
| 3rd Floor: | 876 sq.ft. x $1.35 | $  1,183 |
| 2nd Floor: | 6,090 sq.ft. x $1.35 | 8,221 |
| Mezzanine: | 4,649 sq.ft. x $1.00 | 4,649 |
| 1st Floor: | 4,676 sq.ft. x $1.35 | 6,313 |
| Total | 16,291 sq.ft. | $ 20,366 |
| | | x 12 months |
| Total per annum | | $244,392 |
| | | |
| Vacancy/Collection Loss (10%) | | 24,439 |
| Total Collections | | $219,953 |
| Expenses | | |

---

[28] Mitten/Reynolds used the rentable square footage determined by Ingram/Ewing in their report.

```
16,291 sq.ft. x $.30 x 12                    58,648
Net Operating Income                        $161,305
```

Mitten/Reynolds then used the capitalization rate information for the lease comparables to estimate a capitalization rate of 8.5 percent for the property. Mitten/Reynolds arrived at a value of $1,900,000 (rounded) under the income capitalization approach for the retail/office component of the Redwood City Fox.

Mitten/Reynolds next adjusted this figure for the impact of the Jacobs lease.  Jacobs leased the Second floor office, the Third floor office, and the West retail space, including the mezzanine, at a rate of $3,000 per month, completely net. Referring to the Jacobs lease as the "Master Lease", Mitten/Reynolds modified thus modified their net operating income estimate as follows:

```
Income
  Master Lease: 11,205 sq.ft. x $0.27 net      $ 3,000
  Mezzanine:     2,475 sq.ft. x $1.00 gross      2,475
  1st Floor:     2,611 sq.ft. x $1.35 gross      3,525
  Total per month                              $ 9,000
                                               x 12 months
  Total per Annum                              $108,000

Vacancy/Collection Loss (10%)
  (Applied to non-Master only)                    7,200
Annual Collections                             $100,800
Expenses (non-Master only)
  5,086 sq.ft. x $.30 x 12                      18,310
Modified Net Operating Income                  $ 82,490
```

Mitten/Reynolds then determined that because 69 percent of the commercial space was rented under a long-term below-market lease and that the risk of not receiving that net income was slight, a lower capitalization rate was warranted to reflect the

lower level of risk.  Consequently, Mitten/Reynolds applied a capitalization rate of 7.5 percent to the modified net operating income for a value, reflecting the lease, of $1,100,000 (rounded).  According to Mitten/Reynolds, the $800,000 reduction in value reflected the extent to which the Jacobs lease was below market, as well as the 55-year potential duration of the lease.

### 6.  Mitten/Reynolds--Value Reconciliation

Mitten/Reynolds determined the following values for both components of the Redwood City Fox under the respective approaches:

| Method | Theater | Retail/Office | Total (incl. Land) |
|---|---|---|---|
| Replacement Cost | $3,600,000 | $1,800,000 | $5,400,000 |
| Comparable sales | $3,300,000 | $2,000,000 | $5,300,000 |
| Income Capitalization | n/a | $1,900,000 | n/a |

After correlating all the values, Mitten/Reynolds estimated the market value of the theater to be $3,500,000, and the market value of the retail/office component to be $1,900,000, for a total of $5,400,000.  After reduction for the impact of the Jacobs lease, which reduced the value of the retail/office component to $1,100,000, Mitten/Reynolds arrived at a fair market value of $4,600,000 for the Redwood City Fox as of December 31, 1986.

### B.  Crocker's Expert

Crocker engaged the firm of Carneghi-Bautovich & Partners, Inc. (Carneghi-Bautovich), a real estate appraisal firm with offices in San Francisco and San Jose, to appraise the Redwood

City Fox.  The Carneghi-Bautovich report was prepared by Christopher Carneghi (Carneghi) and Ronald Blum (Blum), and delivered to Crocker in September 1994.  Carneghi and Blum are both certified general real estate appraisers in California and members of the American Institute of Real Estate Appraisers. Carneghi, who is the president of Carneghi-Bautovich, testified at trial regarding his report.

Carneghi determined that the highest and best use of the Redwood City Fox, as improved on the valuation date, was to retain the property as a theater and market it to a nonprofit public or private group capable of generating funds in the future to renovate the building.  Carneghi concluded that the property was in good physical condition and was suited for its current use as a performing arts theater and retail/office space.  Carneghi also noted that "public outcry" would have made demolition of the property "very difficult".

Carneghi valued the theater component separately from the retail/office component of the property.  Carneghi utilized the replacement cost approach and the comparable sales approach for valuing the theater.  Due to its lack of income potential, Carneghi did not consider the income approach an appropriate methodology for valuing the theater.  With respect to valuing the retail/office space, Carneghi utilized the replacement cost, comparable sales, and income capitalization approaches.

### 1. Replacement Cost Approach--Theater

Under the replacement cost approach, Carneghi estimated the value of the underlying land to be $660,000 (rounded), using 5 sales of commercially-zoned vacant land located in Redwood City as comparables ($25.00 per square foot of land area times 26,528[29] square feet). Carneghi adjusted the sales prices on the basis of location, size, site configuration, financing, and date of sale. Carneghi determined the gross building area of the theater component to be 24,358 square feet, which he found was 58.16 percent of the total gross building area of 41,876 square feet. Carneghi thus allocated a land value of $383,902 (58.16 percent of the $660,000 land value) to the theater.

Carneghi next estimated the total direct and indirect construction costs of the theater to be $4,829,000, based on the Adamson estimate. Carneghi did not subtract the cost of the personal property from the Adamson estimate. Carneghi next added 7 percent for "General Conditions", 5 percent for "Contractor's Overhead and Profit", and 12.5 percent for "Developer's Profit", for a total replacement cost new of $6,103,554.

---

[29] Carneghi's estimate uses 24,528 square feet of land area. Ingram/Ewing and Mitten/Reynolds use 26,583 as the number of square feet of land area. Mansbach, respondent's expert, uses the figure 26,584 as the square feet of land area. Carneghi did not explain this discrepancy in his square footage of land area. At $25.00 per square foot, using what we find to be the correct total square footage of the property, 26,583, Carneghi's land value estimate should be $664,575. However, when rounded to $660,000, we find the error in Carneghi's square footage of land area to have no effect on his estimate.

To estimate depreciation, Carneghi determined that, due to the several renovations, the effective age of the theater was less than its chronological age of 57 years. Carneghi thus estimated the effective age of the theater to be 30 years.[30] Based upon the Marshall Valuation Cost Estimation Manual, which estimates the economic life of a good quality, Class C (concrete construction) motion picture or performing arts theater to be 45 years, Carneghi determined that the remaining economic life of the theater was 15 years. Based on the effective age and remaining economic life of the theater, and after consulting the Marshall Valuation Manual depreciation tables, Carneghi estimated the amount of depreciation due to incurable physical deterioration for the theater to be 45 percent, or $2,746,599. Carneghi did not find that deductions for functional obsolescence or external obsolescence were warranted.

Under the replacement cost method, Carneghi valued the theater at $3,740,000 (rounded), computed as follows:

| | |
|---|---|
| Total Replacement Cost New | $6,103,554 |
| Less: Depreciation | (2,746,599) |
| Total Depreciated Value of Improvements | 3,356,955 |
| Add: Land Value | 383,902 |
| Indicated Market Value by Cost Approach | $3,740,857 |

---

[30] At one point in his report, Carneghi states that the effective age of both the theater and the retail/office component is "35 years". However, in his table entitled "Cost Analysis" and in his calculations, Carneghi uses the 30 year figure as the effective age of the property. Consequently, we find the 35 year figure to be a typographical error.

## 2.  Replacement Cost Approach--Retail/Office

Under the replacement cost method for the retail/office component of the property, Carneghi estimated the value of the underlying land to be $276,098 (41.83 percent of the $660,000 total land value).  He then estimated the replacement cost new of the retail/office component to be $1,790,999.  Again, Carneghi relied on the Adamson cost estimate, to which he added 7 percent for "General Conditions", 5 percent for "Contractor's Overhead and Profit", and 12.5 percent for "Developer's Profit".  Accrued depreciation for physical deterioration was estimated to be 34 percent or $608,940, based on an economic life of 50 years (per the Marshall Valuation Cost Estimation Manual), an effective age of 30 years, and the resulting remaining economic life of 20 years.  Carneghi estimated the total value for the retail/office portion of the property under the replacement cost approach to be $1,460,000 (rounded), computed as follows:

| | |
|---|---|
| Total Replacement Cost New | $1,790,999 |
| Less: Depreciation | (608,940) |
| Total Depreciated Value of Improvements | 1,182,060 |
| Add: Land Value | 276,098 |
| Indicated Market Value by Cost Approach | $1,458,158 |

## 3.  Comparable Sales Approach--Theater

For the comparable sales approach, Carneghi analyzed the sales of the San Jose Fox and the Stanford.  Carneghi also looked at the sale of the Circle Star Theater (Circle Star), a live performance theater located in the City of San Carlos, near the

Redwood City border.  The Circle Star is a 72,192-square foot "theater in the round" which was built in 1965.  The Circle Star lacks the ornate architectural quality of the Redwood City Fox, as well as the other comparables.  The site area of the Circle Star is 8.44 net acres and has onsite parking.  The Circle Star has 3,713 seats, 5 cocktail bars, 2 snack bars, a ticket sales and lobby area, and an adjacent 300-seat restaurant with a full kitchen.

The Circle Star was purchased in April 1987 from First Federal Savings Bank of California for $6,450,000, plus a broker's commission paid by the buyers of $96,750, for a total purchase price of $6,546,750.  The purchase price did not include furniture, fixtures, and equipment, which were valued at $750,000.  The buyer renovated the Circle Star at a cost of approximately $2,000,000, and subsequently operated it as a performing arts theater.  In January 1994, a sealed bid auction was held for the sale of the Circle Star, with an asking price of $14,725,000.  As of September 1994, the date of Carneghi's appraisal report, the Circle Star remained for sale.

Carneghi also considered the purchase of the Redwood City Fox by Jacobs in 1981.  Due to Jacobs' renovation of the Redwood City Fox, as well as what Carneghi termed "booming" real estate prices in California between 1981 and 1986, Carneghi gave the 1981 sale secondary consideration "because significant

appreciation occurred between the date of this sale and the appraisal date."

Using both price per seat and price per square foot as units of measurement, Carneghi found that the comparable sales indicated a range of unit values between $1,307 and $1,737 per seat, and $71.71 and $88.36 per square foot. Carneghi adjusted the sales prices on the basis of physical condition, date of sale, location, size, seating capacity, and other physical characteristics.

On a per seat basis, Carneghi estimated a value of $1,600 per seat. Carneghi determined the appropriate number of seats for the Redwood City Fox, based on modern standards (including seat width and handicapped seating and accessibility), to be 1,130 seats. Thus, with 1,130 seats at $1,600 per seat, the indicated value was $1,810,000 (rounded).

On a per square foot basis, Carneghi concluded that a value of $85.00 per square foot was indicated. With 24,358 square feet of gross building area, Carneghi estimated the value of the theater to be $2,070,000 (rounded).

After considering the two values, Carneghi concluded that the value on a per square foot basis was slightly less subjective than on a per seat basis. Carneghi thus concluded the indicated value for the theater component under the comparable sales method was $2,000,000.

### 4.  Comparable Sales Approach--Retail/Office

Under the comparable sales method for the retail/office space, Carneghi looked at 5 sales of small office and commercial buildings, 4 of which were located in Redwood City and 1 of which was located in nearby Menlo Park.  Using the net area square footage as the unit of measurement, Carneghi found that the comparables indicate a range of sales prices between $73.17 and $144.55 per square foot.  Carneghi adjusted the comparable sales prices on the basis of date of sale, building age, size (both lot and gross building area), quality, location, parking, conditions of sale, and economic factors.  Carneghi concluded that a unit value of $90.00 per square foot was indicated for the retail/office space of the Redwood City Fox.  With 16,291 square feet at $90.00 a square foot, Carneghi valued the retail/office space under the comparable sales method at $1,470,000.  This value did not take into account the Jacobs lease.

### 5.  Income Capitalization Method--Retail/Office Space

To calculate annual gross potential income under the income capitalization approach, Carneghi used the income generated by Jacobs' lease (what he termed "contract income") of the West retail space (both ground floor and mezzanine) and the Second and Third floor office spaces, to which he added his estimate of market rent for the East retail space (both ground floor and mezzanine).  Carneghi did not use in his calculations the income

generated by the 1984 lease or the 1987 lease of portions of the property by the County of San Mateo.

Carneghi determined that the rental rate of the Jacobs lease was $.27 per square foot, net of expenses. Carneghi determined that this rental rate was below market.

To estimate market rent (and to make his determination that the rental rate in the Jacobs lease was below market), Carneghi used 8 lease comparables, 5 for ground level spaces and 3 for upper level spaces. Carneghi determined that the range of rents for the upper floor office spaces was $1.07 to $1.30 per square foot on a full service basis,[31] and that the range for the ground floor commercial spaces was $1.03 to $1.30 per square foot on a triple net basis after adjustment for expenses. He further determined that a survey of the relevant area indicated that the lowest rent for office space in Redwood City on the valuation date was $1.15 per square foot, fully serviced.

After considering the location, quality, age, and lack of parking at the Redwood City Fox, Carneghi estimated market rent of $1.10 per square foot, full service, for the Second floor

---

[31] According to Carneghi, office leases are typically on a "gross" basis, whereby operating expenses are borne by the tenant. Office leases can also be on a "full service" basis, whereby operating expenses are borne by the landlord. With respect to retail space, in a "triple net" lease, operating expenses are borne by the tenant, and in a "gross" lease, operating expenses are borne by the landlord.

office space.  Because it was unfinished at the time, Carneghi estimated a lower market rent of $.80 per square foot for the Third floor office space.  After subtracting operating expenses, which he estimated at $.35 per square foot, Carneghi determined the triple net equivalent rent of $.75 per square foot for the Second floor office space, and triple net equivalent rent of $.45 per square foot for the Third floor office space.

For the ground floor of the East retail space, Carneghi estimated a triple net rental rate of $1.20 per square foot.  For the mezzanine floor, he estimated a lower rental rate, triple net, of $.60 per square foot.

Using the net rentable square footage determined by Ingram/Ewing for the different areas, Carneghi estimated the monthly gross potential income for the property.  From this figure, he subtracted a "vacancy and credit loss" for both the space covered under the Jacobs lease and the eastern retail space.  Carneghi stated that a vacancy and credit loss estimate "is often utilized in the market to account for eventual vacancy and credit loss over an investment period."  For the space covered under the Jacobs lease, Carneghi estimated that a zero vacancy deduction was appropriate, and that for the East retail space, a "standard" vacancy and credit loss allowance of 5 percent was appropriate.

Carneghi next subtracted landlord expenses from the annual gross potential income. Because the market rents were estimated on a triple net basis (whereby the tenant is responsible for all expenses including taxes, insurance, maintenance, utilities, and janitorial), the only expenses Carneghi determined to be incurred by the landlord were management and structural reserves. He projected these expenses at 3 percent and 1 percent of effective gross income, respectively.

After subtracting the estimated expenses, Carneghi arrived at an estimate of net operating income for the property. To this figure he applied a capitalization rate of 7.5 percent. Carneghi chose this capitalization rate based on his comparable office building sales, which encompassed a range of capitalization rates of 6.5 percent to 10.5 percent. Carneghi concluded that, after consideration of the quality of the property, its lack of parking, the fact that the retail/office space is small and is part of a larger building, a capitalization rate of 8.0 percent was appropriate. However, in light of the below-market Jacobs lease, which created a low-risk situation for the building owner, a lower capitalization rate of 7.5 percent was warranted.

Carneghi arrived at a value of $1,130,000 (rounded) for the retail/office space under the income capitalization approach, calculated as follows:

Income - All triple net

| | | | |
|---|---|---|---|
| Contract income-Western space + Office | 11,205 sq.ft. at $0.27 | | $3,000 |
| Market rent-Eastern space-Ground floor | 2,611 sq.ft. at $1.20 | | 3,133 |
| Market rent-Eastern space-Mezzanine | 2,475 sq.ft. at $0.60 | | 1,485 |
| Monthly Gross Potential Income | 16,291 | $0.468 | $ 7,618 |
| | | X 12 | X 12 |

| | | | |
|---|---|---|---|
| Annual Gross Potential Income | | $5.61 | $91,418 |
| Less: Vacancy and credit loss at | | | |
| Leased space | 0.0% | | $ 0 |
| Eastern space | 5.0% | | 2,771 |
| Effective Gross Income | | | $88,647 |

| | | | | |
|---|---|---|---|---|
| Less: Landlord expenses | | | | |
| Reserves | 1.0% of effective gross income | | $0.05 | $ 886 |
| Management | 3.0% of effective gross income | | 0.16 | 2,659 |
| Total expenses | | | $0.22 | $ 3,546 |

| | | |
|---|---|---|
| Stabilized Net Operating Income | $5.22 | $85,102 |

| | |
|---|---|
| Overall Capitalization Rate | 0.0750 |

| | |
|---|---|
| Indicated Stabilized Value | $1,134,688 |

| | |
|---|---|
| Rounded | $1,130,000 |

## 6. Carneghi--Value Reconciliation

### a. Theater Value Conclusion

Under the replacement cost approach, Carneghi estimated a value of $3,740,000 for the theater. Under the comparable sales approach, he estimated a value of $2,000,000. With respect to the replacement cost approach, Carneghi stated:

> The Cost Approach is considered a poor indicator of value in this case. No deduction was made in the Cost Approach for functional obsolescence. However, the theater was designed for film exhibition and therefore has some disutility for performance use. Renovations and upgrading will be required as discussed in this report, and the Cost Approach does not fully account for this. Also, for older special purpose buildings, estimating physical obsolescence is subjective. This approach is considered highly unreliable for older special purpose buildings like the subject.

Carneghi considered the comparable sales approach, which was based on contemporaneous sales of "similar old theater buildings" like the Redwood City Fox, to be more reliable.  Consequently, Carneghi accorded the value indicated by the comparable sales approach all the weight and accorded no weight to the value indicated by the replacement cost approach.  Carneghi thus valued the theater portion of the Redwood City Fox at $2,000,000.

### b.  Retail/Office

For the retail/office component of the Redwood City Fox, Carneghi arrived at the following values under the following appraisal methods:

| | |
|---|---|
| Replacement Cost Approach | $1,460,000 |
| Comparable Sales Approach | $1,470,000 |
| Income Approach-Direct Capitalization | $1,130,000 |

With respect to the replacement cost approach, Carneghi again stated that valuation under this method "is not considered a good indicator in valuation of a renovated older building with specialized improvements."  Carneghi found that valuation under the comparable sales approach was a "good indicator" of value, but that the approach did not "consider" the below-market Jacobs lease.  With respect to the income capitalization approach, which utilized both the market rent estimate and the rent generated by the Jacobs lease, Carneghi found that the approach

> is considered a good indicator for the subject property which is impacted by a below market lease.  However, this approach may be unduly impacted by the below market rent although the upside income potential was accounted for in the selection of the capitalization rate.

For these reasons, Carneghi gave more weight to the income capitalization approach, and less weight to the comparable sales and replacement cost approaches.  Carneghi's final estimate of the value of the retail/office portion of the Redwood City Fox was $1,150,000.

### c.  Final Value Conclusion

Carneghi valued the theater component of the Redwood City Fox at $2,000,000, and valued the retail/office component at $1,150,000, for a final value estimate for the Redwood City Fox of $3,150,000 as of December 31, 1986.

### C.  Respondent's Expert

Respondent determined in the notice of deficiency that the value of the Redwood City Fox at the time of the gift was $1,290,000.  This valuation figure was based upon an appraisal report prepared by Lawrence Mansbach (Mansbach).[32]  Mansbach is a member of the Appraisal Institute and a certified General Real Estate Appraiser in California.  Mansbach is a principal in the San Francisco-based firm of Mansbach Associates, Inc., and, in the 1980's, worked for Carneghi, petitioner Crocker's expert, as a principal in Carneghi's firm.  Mansbach testified at trial as respondent's expert.

---

[32] Mansbach's associate, Jean Rote, assisted Mansbach with the preparation of his appraisal report.  The record does not contain additional information regarding Ms. Rote's professional qualifications.

Mansbach initially prepared his appraisal report in early 1994 and submitted it to respondent on March 16, 1994. In early 1996, Mansbach revised his appraisal report, performing what he termed "editorial type * * * modifications" at respondent's request. Mansbach's revised appraisal report was submitted to respondent on April 4, 1996. Mansbach testified that there were no changes in the revised report with respect to his reasoning or his conclusions as to the value of the Redwood City Fox.

For valuing the Redwood City Fox, Mansbach found that the replacement cost method was (1) inappropriate because it would not be "economically feasible to replace the existing structures in today's market", and (2) unreliable due to the subjective nature of estimating accrued depreciation on a 65-year old building with significant functional, exterior, and physical deterioration. Additionally, with respect to the theater component of the property, Mansbach found that the income capitalization approach was inappropriate because "the purchaser of the theater is likely to be a non-profit entity which places little emphasis on its income producing capabilities." Consequently, Mansbach utilized the comparable sales approach for the theater component of the property. For the retail/office component, which Mansbach valued separately from the theater, Mansbach utilized both the sales comparison and income capitalization approaches. Mansbach also included a valuation of the underlying land, as if vacant.

Mansbach determined the following area measurements for the Redwood City Fox:[33]

| Area | Gross Sq.Ft. | Rentable Sq.Ft. | Mezzanine Storage |
|---|---|---|---|
| Theater | 24,358 | 24,358 | |
| East side retail/office | 2,625 | 2,611 | |
| East Mezzanine | 2,625 | | 2,475 |
| Ground floor west retail/office | 2,625 | 2,105 | |
| West Mezzanine | 2,677 | | 2,226 |
| Second floor office space | 6,090 | 6,090 | |
| Third floor space | 876 | 876 | |
| Total | 41,876 | 36,040 | 4,701 |

Mansbach cites the Ingram/Ewing appraisal as the source of these area measurements. Mansbach also cites the Ingram/Ewing appraisal as the source of information regarding "the extent of renovation [of the Redwood City Fox] in 1950 and in the 1980s."

### 1. Highest and Best Use

#### a. As Vacant

Mansbach first determined the highest and best use of the property as vacant. Considering the location and size of the Redwood City Fox, its zoning, neighborhood characteristics, and market influences, Mansbach found that the highest and best use of the property as vacant was for "office development with ground floor retail or business/service use." However, Mansbach recognized that analyzing the property as vacant was essentially "an academic exercise" because:

---

[33] Mansbach cites the Ingram/Ewing appraisal as the source of his building area square footage. We note, however, that Mansbach's gross and rental square footage measurements for the West retail space, both ground floor and mezzanine, differ from those found in the Ingram/Ewing appraisal.

The deed restrictions effectively prohibit demolition of the building. Furthermore, without even such restrictions, any attempt to demolish the building would likely encounter vocal public opposition and a complicated process to obtain a demolition permit.

### b. As Improved

With respect to the highest and best use of the property as improved, Mansbach gave consideration to the Redwood City Fox's "poor operating history", "average" physical condition, and its "poor suburban location". Mansbach also considered the Redwood City Fox's "limited purchase market appeal":

> Overall, it is concluded that there is a very narrow purchase market for the subject theater. The primary purchaser of the historic movie palaces nationwide is a public or non-profit entity. However, this purchase segment typically involves redevelopment agencies within cities, and/or historic foundations. Even public entity purchases of historic theaters over the past decade have generally been limited to urban locations and involved only a few transactions. As such, due to the lack of activity within this purchase market, there is scant evidence to support a highest and best use conclusion for the subject improvements to renovate it to a modern stage facility.

Despite these considerations, Mansbach found that the integrated retail/office portions of the property would have "stronger demand", and that the "value of the subject as currently improved exceeds the value on the land only basis." Mansbach also noted that the Redwood City Fox was "architecturally significant", and that it had some "intrinsic value regardless of its profitability." Mansbach thus concluded that overall, preservation of the existing improvements on the subject site

represented the highest and best use of the property, as improved, on the valuation date.

### 2. Land Valuation

Mansbach chose 5 sales of commercially zoned vacant land as comparables to value the underlying land.[34] After adjustments for factors such as size, location, date of sale, and buyer motivation, Mansbach determined a land value for the site, as if vacant, of $25.00 per square foot. Assigning 26,584 square feet to the property, Mansbach estimated the value of the underlying land to be $665,000 (rounded).

### 3. Comparable Sales Approach--Theater

For the comparable sales approach, Mansbach viewed as comparables the sales of the San Jose Fox, the Circle Star Theater, and the Laurel Theater. Mansbach also considered Jacobs' May 1981 purchase of the Redwood City Fox.

The Laurel Theater was located in the downtown district of San Carlos, California. The property consisted of a 17,500-square foot building on a 27,759-square foot site, which included a 10,259-square foot parking lot. The improvements were built in 1949, and consisted of the Laurel Theater and three retail stores. The improvements were not architecturally significant. The property was purchased in March 1984 for $775,000, and again

---

[34] Mansbach's comparable land sales include 2 sales of the same property, which occurred 12 months apart. At the time of the initial sale, the site was improved with a vacant bakery building.

in December 1989 for $1,200,000. The improvements were demolished thereafter.

Mansbach determined that the 1984 purchase price of the Laurel Theater equated to $44.29 per square foot of building area and $27.92 per square foot of site area. He further determined that the 1989 purchase price of the Laurel Theater equated to $68.57 per square foot of building area and $43.23 per square foot of site area. Mansbach did not provide per seat prices for the two sales of the Laurel Theater.

Mansbach determined that the $2,010,000 purchase price of the San Jose Fox in 1985 equated to $1,300 (rounded) per seat, based on 1,538 "planned" seats, and $82.50 per square foot of building area. Because the San Jose Fox did not have any seats installed when it was sold, Mansbach estimated it would cost between $600,000 to $700,000 to install seats and carpeting in the San Jose Fox.

For the Circle Star Theater, Mansbach determined the 1987 purchase price equated to $1,743 per seat based on the 3,700 seats in the theater, $88.36 per square foot of building area, and $17.08 per square foot of site area.

With respect to Jacobs' purchase of the Redwood City Fox in May 1981, Mansbach determined that the purchase price equated to $1,336 per seat based on 756 seats, $24.85 per square foot of rentable building area, and $37.99 per square foot of site area. Mansbach next added the $829,415 expended by Jacobs for

renovation of the property to the original purchase, which resulted in a per seat price of $2,433, a per square foot of building area price of $69.19, and a per square foot of site area price of $45.25. Mansbach noted that the purchase price paid by Jacobs included the entire building, while he was only valuing the theater component.

Mansbach considered the appropriate unit of comparison among his comparable sales to be the price paid per seat. For the Redwood City Fox, Mansbach determined that the "appropriate seat count to apply in the valuation" was 602. Mansbach acknowledged that the seating capacity of the Redwood City Fox at one time exceeded 1,300, and further acknowledged that 756 seats were installed in the auditorium on the valuation date (602 on the floor and 154 in the balcony). However, due to a "lack of documented demand for the mezzanine seats", Mansbach concluded that a buyer "would not allocate value to these seats in making its price decisions." Mansbach explained his choice of 602 seats as follows:

> The appraiser was not provided information on the total potential capacity of the theater given modern requirements for seat and aisle width, as well as handicapped seating. Nevertheless, the valuation of the subject property based on the theoretical maximum seating would require a deduction from value to account for the cost of installing such seats. More importantly, with inadequate demand, the market would not place a value on the subject property based on the theoretical maximum seating. Rather, with demand for only 602 seats at best, there would be no economic reason to spend such money for additional seats, as well as bear the added costs for maintenance, management and potentially insurance.

Among his comparables, Mansbach considered the San Jose Fox to be the most comparable to the Redwood City Fox. Mansbach adjusted the $1,300 per planned seat purchase price of the San Jose Fox downward on the basis of its purchase by a public entity and its urban San Jose location. Mansbach then considered this downward adjustment to be largely offset by the San Jose Fox's lack of seating and carpeting at the time of purchase. Overall, Mansbach found that the purchase of the San Jose Fox supported an estimated value of the Redwood City Fox of $1,300 per seat.

With respect to the Circle Star Theater and the Laurel Theater, Mansbach determined that the purchase prices equated to land value only, with little allocation to the improvements. Mansbach concluded that these sales supported a value for the Redwood City Fox equivalent to land value. Allocating 20,089 square feet to a footprint of the theater site and a land value of $25.00 per square foot, Mansbach determined a land value of $502,225 for the theater component of the property. Mansbach found that this $502,225 value allocation equated to $835 per seat for the 602 seats in the theater.

After considering the $1,300 per seat value supported by the purchase of the San Jose Fox and the $835 per seat value, assuming a land only value allocation, Mansbach concluded that a "mid-range average per seat value" of $1,100 was appropriate. With 602 seats, Mansbach valued the theater portion of the

Redwood City Fox under the comparable sales method at $660,000 (rounded).

### 4. Comparable Sales Approach--Retail/Office

Under the comparable sales approach for the retail/office portion of the Redwood City Fox, Mansbach utilized 5 sales of commercial property in Redwood City.  Two of Mansbach's sales involve the same property.  All the sales were for fully occupied free standing buildings located within a 1-mile radius of the Redwood City Fox.

Mansbach's unit of comparison was price per square foot of building area.  The comparable sales ranged in price from approximately $77.00 to $142.00 per square foot.  Mansbach adjusted the sales for factors such as date of sale, condition, location, physical characteristics, and income characteristics.  Mansbach determined that the sales supported a value for the retail/office component of the Redwood City Fox of $87.50 per square foot of "true rentable area".  Mansbach determined the "true rentable area" of the property to be 11,682 square feet, consisting of the following:

| Area | Rentable Sq.Ft. |
| --- | --- |
| East Retail | 2,611 |
| West Retail | 2,105 |
| Second Floor Office | 6,090 |
| Third Floor Office | 876 |
| Total | 11,682 |

Mansbach did not include the mezzanine floors as rentable space because

> [g]iven the storage use and low income potential associated with the mezzanine space due to its low ceiling heights, it is anticipated that a potential buyer would not allocate value to this space in making its price decision.

Mansbach also allocated 50 percent of the $87.50 determined value to the 876 square feet available in the Third Floor office space due to its "shell condition" and use as storage space at the time of donation.

Under the comparable sales method, Mansbach estimated the value of the retail/office component of the property to be $983,850, computed as follows:

```
10,806 square feet x $87.50 = $945,525
   876 square feet x $43.75 =    38,325

Total indicated value          $983,850
```

### 5.   Income Capitalization Approach--Retail/Office

With respect to the income capitalization approach, Mansbach determined a value for the retail/office component, both with and without the Jacobs lease.  Mansbach did not consider either the 1984 lease or the 1987 lease by the County of San Mateo in his income capitalization calculations.

To determine economic rent for the property, Mansbach looked at average income and expense information for suburban office and retail buildings in the San Francisco Bay Area in 1987 compiled

by the Building Owners & Management Association (BOMA).[35]   The

BOMA information reported median income of $1.26 per square foot

for office space and $1.40 per square foot of retail space, both

on a full service expense structure.

In addition to the BOMA information, Mansbach utilized 4

full service leases of commercial property, which he viewed as

comparables.  One of the properties used by Mansbach as a lease

comparable was located in Belmont, a city neighboring Redwood

City.  The other three were located in Redwood City.  However,

Mansbach did not provide an address for one of the properties

located in Redwood City, nor did he provide an address for the

property located in Belmont.[36]  Mansbach stated that the lease

information was provided by Cornish & Carey, a local commercial

real estate firm.  In addition to providing the lease

information, brokers from Cornish & Carey told Mansbach that

rents within the mid-San Mateo County area for office space, as

well as commercial space within the immediate subject market

area, averaged at $1.00 per square foot per month on a full

service expense structure.

After consideration of the lease comparables and the other

information, Mansbach concluded that an average market rent, with

---

[35] According to Mansbach, BOMA is an organization which has "established industry standards in terms of building area measurements, income and expenses, on a nationwide basis."

[36] Mansbach listed "NA" as the location for these properties in his comparable office leases table.  We assume "NA" to mean "not applicable".

a full service expense structure, would be $1.00 per square foot per month for the retail/office portion of the Redwood City Fox. Mansbach assigned 50 percent of this value, or $.50, to the 876 square feet of the Third Floor office space. For the 4,701 square feet of mezzanine space, Mansbach assigned a "storage rent" of $.25 per square foot per month.

Mansbach estimated total potential gross income from the property as of the valuation date, based on the above market rents, to be $149,031. From this figure, Mansbach deducted a vacancy and collection loss of 5 percent to arrive at effective gross income of $141,579.

Mansbach's market rent estimates were stated on a full service basis, whereby the landlord is responsible for all associated expenses. Based on the actual expenses incurred by Jacobs' lease of the property from 1987 through 1992, as well as average reported expenses from the BOMA survey, Mansbach estimated expenses for the retail/office component at $4.95 per square foot, per month. Included in his estimated expenses were a "management and administration" expense of 3 percent of effective gross income, and a "reserves" expense of 2 percent of effective gross income.

Mansbach chose a capitalization rate of 9 percent. In estimating this rate, Mansbach analyzed a survey reported in the January 1987 issue of the Appraisal Journal which identified institutional investors' criteria for investment, as of the

summer of 1986. This survey indicated a range of rates from 8 to 11 percent. Mansbach also considered the capitalization rates based on his comparable sales, all of which were fully occupied by tenants when sold. His comparables indicated a range of capitalization rates from 8.25 to 11.48 percent. Mansbach concluded that the 9-percent rate was appropriate based on the Redwood City Fox's lack of onsite parking and lack of investment appeal, due to the fact that the retail/office space was not a free standing building.

Mansbach estimated the value of the retail/office component of the Redwood City Fox under the income capitalization method, without considering the impact of the Jacobs lease, to be $930,000 (rounded), computed as follows:

```
REVENUE
Market Rent:              10,806 sq.ft. @ $12.00 =      $129,672
                            876 sq.ft. @   6.00 =          5,256
                          4,701 sq.ft. @   3.00 =         14,103
Total Potential
Gross Income             16,383 sq.ft. @   9.10 Avg.              $149,031

Less Vacancy & Collection Loss        @  5.00%                     (7,452)

Effective Gross Income                                            $141,579

EXPENSES
Taxes                                               $9,303
Utilities                $1.50 per sq.ft.           17,523
Maintenance & Repairs     1.75 per sq.ft.           20,444
Insurance                 0.30 per sq.ft.            3,505
Management                3.00% effective gross income   4,247
Reserves                 2.00% effective gross income   2,832

Total Expenses           $4.95 per sq.ft.          $57,853        (57,853)

Net Operating Income                                             $83,726

Capitalized @ 9.00%                                              $930,294
Rounded to                                                       $930,000
```

Without considering the Jacobs lease, Mansbach estimated the following values for the retail/office component of the Redwood City Fox:

Comparable Sales Approach:        $983,850
Income Capitalization Approach:   $930,000

Mansbach considered the comparable sales approach to be "weakened by the lack of directly comparable properties, as none of the properties had both commercial and office income potential, nor a location within the immediate neighborhood."  Consequently, placing more emphasis on the income capitalization approach, Mansbach estimated the value of the retail/office component of the Redwood City Fox, as of December 31, 1986, and without consideration of the Jacobs lease, to be $950,000.

Mansbach also determined a value for the retail/office component of the Redwood City Fox under the income capitalization approach incorporating the provisions of the Jacobs lease. Mansbach found that the rentable area leased by Jacobs was 9,071 square feet.  Mansbach excluded the 2,226 square feet of space on the mezzanine floor from his calculations.  Utilizing both his estimated market rent and the contract rent paid by Jacobs, Mansbach estimated potential gross income to be $71,019.  From this figure he again deducted 5 percent for a vacancy and collection loss.

With respect to expenses, Mansbach noted that the Jacobs lease was triple net, whereby Jacobs was responsible for his pro rata share of expenses.  Mansbach determined that the Jacobs

lease covered all but 22 percent of the rentable area. Consequently, Mansbach reduced effective gross income by only 22 percent of the expenses he had previously estimated. With respect to the capitalization rate, Mansbach did not change it from the 9 percent he previously estimated without consideration of the Jacobs lease.

Incorporating the provisions of the Jacobs lease, Mansbach estimated the value of the retail/office component of the Redwood City Fox under the income capitalization method to be $631,000 (rounded), computed as follows:

```
REVENUE
Contract Rent:          9,071 sq.ft. @ $ 3.97 =      $36,000
Market Rent:            2,611 sq.ft. @  12.00 =       31,332
                        2,475 sq.ft. @   3.00 =        7,425
Total Potential
Gross Income           14,157 sq.ft. @   5.28 Avg.               $74,757

Less Vacancy & Collection Loss        @  5.00%                    (3,738)

Effective Gross Income                                            71,019

EXPENSES
Taxes                                            $1,389
Utilities              $1.50 per sq.ft.           3,917
Maintenance & Repairs   1.75 per sq.ft.           4,569
Insurance               0.30 per sq.ft.             783
Management              3.00% effective gross income   2,131
Reserves                2.00% effective gross income   1,420

Total Expenses         $1.22 per sq.ft.          $14,209        (14,209)

Net Operating Income                                            $56,810

Capitalized @ 9.00%                                            $631,227
Rounded to                                                     $631,000
```

### 6. Mansbach--Value Reconciliation

Mansbach estimated the value of the Redwood City Fox, as of December 31, 1986, and considering the Jacobs lease, to be $1,290,000 (rounded), computed as follows:

| | |
|---|---|
| Theater Value Estimate | $660,000 |
| Retail/Office Value Estimate | 631,000 |
| Total Value Estimate | $1,291,000 |

OPINION

I.  Introduction

There is no dispute that petitioners' gift of the Redwood City Fox and associated personal property to the Players is a charitable contribution deductible under section 170(a)(1).  We find and hold that the fair market value of the personal property on the date of donation was $96,000.  Consequently, we need only decide the fair market value of the Redwood City Fox as of December 31, 1986, for purposes of determining the proper amount of petitioners' charitable contribution deduction and carryover deductions.[37]  We must also decide whether Jacobs is liable for an addition to tax and penalties for the years at issue.

The fair market value of donated property is the price at which the property would change hands between a willing buyer and

---

[37] Petitioners initially argued that respondent was precluded from redetermining the value of petitioners' 1986 charitable donation because the period of limitations under sec. 6501 had expired for taxable year 1986 at the time respondent issued the notices of deficiency.  Petitioners make no argument regarding the statute of limitations in their briefs and appear to have conceded this point.  We note, however, that petitioners executed extensions pursuant to sec. 6501(c)(4), and the notices of deficiency were timely issued for each taxable year within the period as set forth in sec. 6501(a).  Although the charitable contribution from which the carryovers arose was outside of these periods, sec. 6501 does not foreclose this Court from looking to a closed year to redetermine petitioners' tax liability for the years at issue.  See Barenholtz v. United States, 784 F.2d 375, 380-381 (Fed. Cir. 1986); see also Angell v. Commissioner, T.C. Memo. 1986-528, affd. without published opinion 861 F.2d 723 (7th Cir. 1988).

a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The standard is objective, using a purely hypothetical willing buyer and seller. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). The fair market value of property as of any given date is an issue of fact to be resolved by considering and weighing all the relevant evidence in the record. Symington v. Commissioner, 87 T.C. 892, 896 (1986); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). While we must consider the entire record, we have broad discretion to decide what facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason." Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court. Petitioners have the burden of proving that the fair market value of the donated property exceeds the value determined by respondent in the notices of deficiency. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987); McGuire v. Commissioner, 44 T.C. 801, 806-807 (1965).

II. Fair Market Value of the Redwood City Fox

The experts' conclusions regarding the fair market value of the Redwood City Fox as of December 31, 1986, are as follows:

|                | Theater     | Retail/Office | Total Value |
|----------------|-------------|---------------|-------------|
| Ingram/Ewing   | $3,850,000  | $1,448,000    | $5,300,000  |
| Mitten/Reynolds | 3,500,000  | 1,100,000     | 4,600,000   |
| Carneghi       | 2,000,000   | 1,150,000     | 3,150,000   |
| Mansbach       | 660,000     | 631,000       | 1,290,000   |

Based upon their respective expert's report and testimony, the parties take the following positions regarding the fair market value of the Redwood City Fox:[38]

|            | Theater                   | Retail/Office             | Total Value               |
|------------|---------------------------|---------------------------|---------------------------|
| Jacobs:    | $3,850,000 to 3,500,000   | $1,150,000 to 1,100,000   | $5,000,000 to 4,600,000   |
| Crocker:   | 2,000,000                 | 1,000,000                 | 3,000,000                 |
| Respondent: | 660,000                  | 631,000                   | 1,290,000                 |

In arriving at their estimated fair market values, the experts in these cases relied upon one or more of the three commonly recognized methods of valuing real property and other assets: (1) The replacement cost approach;[39] (2) the comparable sales approach;[40] and (3) the income capitalization approach.[41]

---

[38] Respondent requests that we sustain the value determined by Mansbach and find that the fair market value of the Redwood City Fox was no greater than $1,290,000. Thus, while respondent does not request separate findings of fact with respect to the theater and retail/office components of the property, we assume the values for the separate components estimated by Mansbach to be reflective of respondent's position.

[39] See Marine v. Commissioner, 92 T.C. 958, 983 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). For purposes of this opinion, the terms "replacement" and "reproduction", when used to describe cost, are synonymous.

[40] See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229
(continued...)

The significant divergence in the above estimates and the parties' positions can be attributed mainly to their disagreement as to validity of the replacement cost method for judging the fair market value of the Redwood City Fox on the date it was transferred to the Players. Before addressing the parties' contentions regarding the most appropriate valuation methodology, we note several points on which the parties agree.

First, the experts agreed that the highest and best use of the Redwood City Fox, as improved on the date of the gift, was its preservation and continued use as theater and retail/office space. We agree that the evidence supports preservation of the property as its highest and best use, and we so find.[42] Accordingly, our decision with respect to the fair market value of the property shall reflect its preservation and continued use as a theater and retail/office space. See Frazee v. Commissioner, 98 T.C. 554, 563 (1992); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986).

Second, the parties agree, and we find that, because the theater will not be operated for the production of income, the income capitalization approach is not appropriate to value the

---

[40](...continued) n.24 (1987); Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).

[41] See Narver v. Commissioner, 75 T.C. 53, 90 n.17, affd. per curiam 670 F.2d 855 (9th Cir. 1982).

[42] We agree with Reynolds, Jacobs' expert, that the Redwood City Fox is a property "for which the profit is cultural rather than monetary."

theater component of the Redwood City Fox.  Conversely, the parties agree, and we find, that the income capitalization approach is an appropriate method to value the retail/office component of the property.

Finally, consistent with our findings regarding the highest and best use of the property and the nonincome producing nature of the theater, we agree with the appraisers that the willing purchaser for the Redwood City Fox would be a public or private nonprofit entity that intends to use the property as it was on the date of donation.

We now turn to the parties' dispute regarding the validity of the replacement cost approach with respect to valuing the Redwood City Fox.

Jacobs contends that the property should be valued primarily by use of the replacement cost method, with secondary consideration given to the comparable sales approach.  He submits that the comparable sales approach to fair market value alone is not reliable where "there is a limited market and limited comparable sales, where there is special purpose property and where preservation is the highest and best use."  Because the Redwood City Fox is "unique and of a significant historical importance to the Redwood City community" and because "there are only two possible comparables, i.e., the Stanford Theatre and the San Jose Fox", Jacobs argues that the replacement cost approach, supported by the comparable sales approach, is the proper method of valuation.

Crocker contends that the best method to value both the theater component and the retail/office component of the property is the replacement cost method because there are no true comparable sales:

> There are no comparable sales of a historic movie palace such as the Fox Theater with its appendage, the Retail/Office Space. There are comparable sales of the parts, but not the whole, and in our case, for appraisal value purposes, the whole is bigger than the sum of its parts.

Because each appraiser determined that the property should be preserved, and "the whole is inseparable", Crocker argues the property must be valued by use of the replacement cost method.

Respondent's position is that comparable properties--the San Jose Fox and the Stanford Theater--were sold during the relevant time period, and, therefore, these transactions should be given primary emphasis in the determination of fair market value. Respondent disputes the reliability of the replacement cost method in this instance for a number reasons, and further argues that the comparable sales transactions demonstrate that the fair market value of the Redwood City Fox is "not equal to * * * [its] replacement cost, but rather, it is far less."

This Court has held that replacement cost may be considered in valuing property. Cupler v. Commissioner, 64 T.C. 946, 955 (1975). However, replacement cost is an appropriate measure of value only where the taxpayer establishes a probative correlation between such cost and the fair market value of the property.

<u>Estate of Palmer v. Commissioner</u>, 839 F.2d 420, 424 (8th Cir. 1988), revg. and remanding 86 T.C. 66 (1986).[43]

Generally, a correlation between replacement cost and fair market value has been proved where the property is unusual in nature and other methods of valuation, such as comparable sales or income capitalization, are not applicable because of the property's uniqueness and nonincome-producing nature. See, e.g., <u>Estate of Palmer v. Commissioner</u>, 839 F.2d at 424. While we have found that the income capitalization method is not appropriate to value the theater portion of the Redwood City Fox, the comparable sales method is appropriate because two properties which we find to be substantially similar to the Redwood City Fox were sold close in time to the valuation date of December 31, 1986.

The San Jose Fox is a 24,363-square foot "movie palace" that opened in 1927. The Redevelopment Agency of the City of San Jose purchased the San Jose Fox in September 1985 with the intent to renovate the theater and revitalize the downtown area of San Jose. Similarly, the Stanford Theater is a 22,313-square foot movie theater that was built in 1925, and, while not a live performance theater, is similar in size and attractiveness to both the San Jose Fox and the Redwood City Fox. It was purchased

---

[43] In published guidelines, respondent has taken a similar approach to the use of reproduction cost in valuing property for purposes of the sec. 170 deduction. Such guidelines direct that "fair market value depends upon value in the market and not on intrinsic worth", and that reproduction cost is to be considered, but only to the extent it is probative of value. Rev. Proc. 66-49, secs. 2.04, 2.07, 1966-2 C.B. 1257, 1257-1258.

in December 1987 by the Packard Foundation, which then completely renovated the theater and reopened it for the exhibition of classic films.

We think the sale of the San Jose Fox and the sale of the Stanford establish a benchmark by which to value the Redwood City Fox. It is true that these properties did not have adjacent commercial space. However, the value of the Redwood City Fox would be no less than the value of its theater component. And we find that the theater component can be reliably valued by looking to the sales of the San Jose Fox and the Stanford. The fact that the theater component could not be purchased separately from the retail/office component and vice versa, is, in our view, an important element deserving of consideration in the process of determining the fair market value of the Redwood City Fox. However, we think that the adjacent commercial space does not preclude valuation on the basis of the sales of comparable properties. All of the experts considered these transactions to represent comparable sales. Additionally, all of the experts presented evidence of sales of retail and office property which they considered comparable to the retail/office component of the Redwood City Fox. And finally, all the experts arrived at a fair market value for the Redwood City Fox by valuing the theater component separately from the retail/office component, and then adding the resulting values together. We see no need to deviate from the approach adopted by the experts in order to reach our ultimate determination of fair market value.

We agree with petitioners that the Redwood City Fox was possessed of much architectural significance and was a unique property. However, we do not agree that the presence of both theater space and commercial space mandates reliance on the replacement cost method to value the property.

When dealing with an older, historic structure such as the Redwood City Fox, it is questionable whether the replacement cost method can be used to provide a true indication of the fair market value of the property. Crocker's expert, Carneghi, recognized in his appraisal report that the replacement cost approach is considered "highly unreliable for older special purposes buildings" like the Redwood City Fox.[44] This unreliability is demonstrated by the variation in the amount of accrued depreciation utilized by the experts.[45] A further problem recognized with the use of the replacement cost method is the assumption that one would actually reproduce the improvements involved. United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 403 (1949). It is questionable whether a willing buyer, such as a public entity or philanthropic

---

[44] Jacobs' expert, Reynolds, also stated in his appraisal report that the replacement cost method is commonly used to value proposed or new buildings.

[45] Ingram/Ewing used 19 percent for the theater and 15 percent for the retail/office component. Reynolds used 55 percent for theater, and 25 percent for the retail/office component. Carneghi used 45 percent depreciation for the theater, and 34 percent for the retail/office component. Carneghi subsequently testified that the replacement cost method was inappropriate under the circumstances.

organization, would pay to reproduce the Redwood City Fox, which derives a great deal of its appeal from the fact that it was built in 1928 and reflects the architectural charm of that era. Consistent with this, Jacobs' expert, Reynolds, testified that "one wouldn't replicate this theater, because it wouldn't be historic if it were replicated." Moreover, in light of the many historically distinctive features, it is doubtful that a building such as the Redwood City Fox could be constructed today. Indeed, Jacobs testified that he would not replicate the property:

> The Fox Theater, to me, if I had to -- and I've built forty-five concrete buildings before in my time. If I had to take the contract to replicate the Fox Theater from scratch, I wouldn't take it for $10 million. I think it would be a very difficult thing to build, rebuild for that price.

After considering the evidence presented and the arguments of the parties, we find that petitioners have not proven the requisite probative correlation between the reproduction cost of the Redwood City Fox and its fair market value.[46] Accordingly, we confine ourselves to an examination of the expert valuations utilizing the comparable sales method, as well as the income capitalization method for the retail/office component.

While we do not consider the replacement cost of the Redwood City Fox to be indicative of its fair market value, after comparing the substance and reasoning of each appraisal report,

[46] Both petitioners recognize that the replacement cost approach to valuation is not favored. On brief, Jacobs stated that "[t]here is no question that there exists a preference for the market data approach." Crocker also stated on brief that the "comparable sales method is the preferred method."

as well as the testimony presented at trial, we conclude that petitioners have successfully established that respondent's determination with respect to the fair market value of the Redwood City Fox is deserving of adjustment.

We again note that valuation is not a precise science, and determining the fair market value of donated property on a given date is a question of fact to be resolved on the basis of the entire record. See McShain v. Commissioner, 71 T.C. 998, 1004 (1979); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). Expert opinion evidence is obviously admissible and relevant on the question of value and is intended to help the Court understand areas requiring specialized training, knowledge, or judgment. However, expert opinion sometimes aids the Court in determining valuation; other times it does not. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate expert opinions in light of the demonstrated qualifications of the expert and all other evidence of value in the record. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986). As the trier of fact, we are not bound by the opinion proffered by any expert witness when that opinion contravenes our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v.

Commissioner, 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of such an opinion, Parker v. Commissioner, supra at 562. Consequently, we consider expert opinion testimony only to the extent that it aids us in arriving at the fair market value of the property. Moreover, because valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific testimony, provided that it is within the range of figures that properly may be deduced from the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178.

With these principles in mind, we turn to valuation of the Redwood City Fox. We discuss the theater component of the property separately from the retail/office component.

A. Valuation of Theater Component

Utilizing the comparable sales approach, the experts estimated the following values for the theater component of the Redwood City Fox:

|                 | Value Estimate |
| --------------- | -------------- |
| Ingram/Ewing    | $3,850,115     |
| Mitten/Reynolds | 3,300,000      |
| Carneghi        | 2,000,000      |
| Mansbach        | 660,000        |

As the above figures indicate, respondent's expert, Mansbach, valued the theater component much lower than the other

experts. In considering Mansbach's opinion with respect to the theater component of the Redwood City Fox, we find several problems that seem to account for much of the difference between Mansbach's value conclusions and the value conclusions of petitioners' experts.

First, Mansbach considered the appropriate unit of comparison among his comparable sales to be the price paid per seat. For the Redwood City Fox, he determined that the "appropriate seat count to apply in the valuation" was 602. Mansbach acknowledged that the seating capacity of the Redwood City Fox at one time exceeded 1,300, and further acknowledged that 756 seats were installed in the auditorium on the valuation date. However, due to a "lack of documented demand for the mezzanine seats", Mansbach concluded that a buyer "would not allocate value to these seats in making its price decisions." Thus, he concluded that "the market would not place a value on the subject property based on the theoretical maximum seating."

We disagree with this conclusion. Jacobs' experts, Mitten/Reynolds, found that price paid per seat was not an appropriate unit of comparison because the number of seats in a theater is not fixed. Crocker's expert, Carneghi, felt that a purchaser would consider the maximum seating capacity a theater has to offer in making his or her decision. Carneghi determined that the appropriate number of seats for the Redwood City Fox, based on modern standards, was 1,130 seats. However, Carneghi concluded that the value indicated on a per square foot of

building area basis was less subjective than the value indicated on a per seat basis.

Mansbach's conclusion regarding the appropriate seat count for the Redwood City Fox is further called into question by his analysis of his comparable sales. He was unable to provide the seating capacity for one of his comparable sales, the Laurel Theater. Additionally, the San Jose Fox, which Mansbach considered the most comparable to the Redwood City Fox, had no seats when it was sold. Mansbach thus evaluated the sale of the San Jose Fox on the basis of 1,538 "planned" seats.

We find, for comparison purposes, the appropriate seat count for the Redwood City Fox to be 1,130. We do not agree with Mitten/Reynolds that number of seats is not a proper unit of comparison. With respect to how the number of seats affects value, Crocker's expert, Carneghi, stated:

> I'm not relating the seats based on their income potential. I'm relating the seats based on their audience potential. So in the market comparison, the prospective buyer of the subject or any of my comparables, I believe would logically say, as San Jose did, "I know the theater's not going to make a profit; we all know cultural facilities don't make profits. But what I -- what I want to know is, how much of my population, how much of my market can this theater accommodate -- i.e., how many people can I seat in this theater?" That has to be an influence on value.

We agree with Carneghi's analysis on this issue. While we realize that a purchaser would not be interested in the number of seats as a measure for the potential income stream the theater could generate, we think a purchaser would assign value to the theater based on the number of patrons the theater could

accommodate.  We also agree with Carneghi's conclusion that the square footage of building area is a less subjective measure than price paid per seat.

Another problem we find with Mansbach's appraisal is his omission of the December 1987 sale of the Stanford Theater as a comparable sale.  Mansbach admitted that his omission of the Stanford Theater was a mistake, and we agree that it was.  Mansbach further testified that inclusion of the Stanford Theater as a comparable sale would not have changed his value conclusion.  Despite this testimony, we have difficulty relying on his opinion, arrived at without considering one of the two comparable properties available.

We also find error in Mansbach's adjustments to the sales price of the San Jose Fox.  Mansbach found that the condition of the San Jose Fox was "inferior" on its sale date to the condition of the Redwood City Fox.  Despite the San Jose Fox's inferior condition, Mansbach considered any upward adjustment for condition to be offset by downward adjustments on the basis of the San Jose Fox's superior location and its purchase by a nonprofit entity.  While we agree that a downward adjustment for location is appropriate, we do not agree that a downward adjustment is warranted on the basis of the San Jose Fox's purchase by a government entity.  There is no evidence in the record to suggest that this sale was anything but adversarial, legitimate, and at arm's length.  Consequently, we do not see how

the identity of the purchaser would support a downward adjustment to the sales price of the San Jose Fox.

On brief, respondent argues that the sales prices of the San Jose Fox and the Stanford Theater "should be adjusted downward to account for the thin market participant potential in Redwood City." While we realize that lack of a market is a factor to consider in evaluating the fair market value of property, we do not think it is an appropriate adjustment here. Respondent admits that the sale of the San Jose Fox, as well as the sale of the Stanford Theater, represent comparable sales. The fact that there are comparable sales belies respondent's argument in this regard. Additionally, as mentioned, there is no evidence in the record to suggest that these properties were acquired by the respective purchasers for anything less than fair market value.

Furthermore, we are troubled by the fact that the value conclusions proffered by Mansbach, respondent's expert, appear to focus on the views of the buyer, to the exclusion of the seller. See Mandelbaum v. Commissioner, T.C. Memo. 1995-255 (expert's disregard for views of a willing seller may be fatal to the expert's opinion), affd. without published opinion 91 F.3d 124 (3d Cir. 1996); see also Estate of Cloutier v. Commissioner, T.C. Memo. 1996-49. Although a buyer would most likely want to purchase the Redwood City Fox at Mansbach's ascertained value, the test of fair market value rests on the concept of a hypothetical willing buyer *and* a hypothetical willing seller. Ignoring the views of the willing seller is contrary to this

well-established test, and, as mentioned above, may be fatal. In this regard, our reading of Mansbach's appraisal report does not persuade us that he ever considered whether a hypothetical willing seller would sell the Redwood City Fox for the value he determined. In light of the prices the sellers of the San Jose Fox and the Stanford received, as well as the income producing potential of the retail/office component of the property, we think it is doubtful that a hypothetical seller of the Redwood City Fox would be willing to sell the property for $1,290,000, if he or she were not under a compulsion to sell.

Based on the above errors, we are not convinced that Mansbach's appraisal is a reliable reflection of the fair market value of the theater component of the property. We are also not convinced that the Ingram/Ewing and Mitten/Reynolds appraisals are reflective of the fair market value.

Ingram/Ewing performed what they termed a "market approach value estimate" by adding the projected renovation costs of the San Jose Fox to its $1,307 per seat purchase price. This resulted in an upward adjustment of $3,013, for a total of $4,320 per seat. They then estimated the value of the Redwood City Fox, by comparison to the San Jose Fox, to be $4,881,850 (1,130 seats at $4,320 per seat). From this figure, Ingram/Ewing then deducted what they estimated to be the restoration cost of the Redwood City Fox. After an adjustment for inflation, Ingram/Ewing estimated a value of $3,850,115 for the theater component of the Redwood City Fox.

We believe their adjustment for physical condition was too high in view of the location of the San Jose Fox. Similarly, Mitten/Reynolds concluded that the sales of the San Jose Fox and the Stanford, whose purchase prices equated to $82.50 per square foot and $71.71 per square foot, respectively, indicated a fair market value for the Redwood City Fox of $135 per square foot. As with Ingram/Ewing, we are not persuaded that such large upward adjustments to the purchase prices of the San Jose Fox and the Stanford are warranted. We think the location of the Redwood City Fox was inferior to the locations of the comparable properties. Consequently, we find that Ingram/Ewing and Mitten/Reynolds approaches resulted in an inflated fair market value.

After examination of the record, we find Crocker's expert, Carneghi, to be more persuasive than the other experts. As mentioned above, where we find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, we may accept the opinion of the expert in its entirety. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. at 452. In these cases, with respect to the theater component of the property, we accept Carneghi's opinion in its entirety.

Carneghi considered the sales of the San Jose Fox, the Stanford, and the Circle Star to be comparable to the Redwood City Fox. Carneghi also considered the purchase of the Redwood City Fox by Jacobs in May 1981. Due to Jacobs' renovation of the Redwood City Fox, as well as what Carneghi termed "booming" real

estate prices in California between 1981 and 1986, Carneghi gave the May 1981 sale of the Redwood City Fox to Jacobs secondary consideration "because significant appreciation occurred between the date of this sale and the appraisal date."

Using both price per seat and price per square foot as units of measurement, Carneghi found that the comparable sales indicated a range of unit values of between $1,307 and $1,737 per seat, and $71.71 and $88.36 per square foot. Carneghi determined that the Circle Star sold basically for land value, and consequently he did not further consider its sale in his analysis. Carneghi adjusted the sales prices of the San Jose Fox and the Stanford on the basis of physical condition, date of sale, location, size, seating capacity, and other physical characteristics.

On a per seat basis, Carneghi estimated a value of $1,600 per seat. Carneghi determined the appropriate number of seats for the Redwood City Fox, based on modern standards (including seat width and handicapped seating and accessibility), to be 1,130 seats. Thus, with 1,130 seats at $1,600 per seat, the indicated value was $1,810,000 (rounded).

On a per square foot basis, Carneghi concluded that a value of $85.00 per square foot was indicated. With 24,358 square feet of gross building area, Carneghi estimated the value of the theater to be $2,070,000.

As mentioned above, Carneghi concluded that the value on a per square foot basis was slightly less subjective than on a per

seat basis. Carneghi thus concluded that the indicated value for the theater component under the comparable sales method was $2,000,000.

We are convinced that Carneghi's appraisal is the best reflection of the fair market value of the theater component of the Redwood City Fox. Consequently, we find that the fair market value of the theater component of the Redwood City Fox as of December 31, 1986, was $2,000,000.

B. Valuation of Retail/Office Component

With respect to the retail/office component of the Redwood City Fox, we agree with petitioners that none of the office buildings considered by the experts were truly comparable. Unlike the Redwood City Fox, all were free standing structures with onsite parking. None were constructed in the 1920's, and none possessed any historical significance. Moreover, an investor would be free to purchase the properties without the additional purchase of a theater also. While it is our view that these differences do not mandate use of the replacement cost method to value the property, we find that they preclude the use of the comparable sales approach as a reliable indicator of fair market value. Furthermore, we think that a willing buyer, such as a nonprofit entity, would accord value to the retail/office component of the property on the basis of its income producing potential. Consequently, and in light of the Jacobs lease, which all the experts found to be below market, we conclude that the

income capitalization approach is the most appropriate method for valuing the retail/office component of the Redwood City Fox.

Under the income capitalization approach, with consideration given to the impact of the Jacobs lease, the experts[47] estimated the following fair market values for the retail/office component of the Redwood City Fox:

|  | Value Estimate |
|---|---|
| Mitten/Reynolds | $1,100,000 |
| Carneghi | 1,130,000 |
| Mansbach | 631,000 |

As was the case with the theater component, Mansbach's estimated value is significantly lower than the other experts' estimates. As was also the case with the theater component, in evaluating Mansbach's opinion, we find several errors[48] that seem

---

[47] Ingram/Ewing did not estimate a value for the retail/office component of the property under the income capitalization method.

[48] The first problem is the amount of market rent Mansbach estimated the property would command. Mansbach cites the BOMA survey, which indicated median market rent on a full service basis of $1.26 per square foot per month for office space and $1.40 per square foot per month for retail space in the Bay Area in 1987. However, Mansbach estimates the market rent for the property, both the ground floor and the upper floors, to be $1.00 per square foot per month on a full service basis. Mansbach bases his estimate on "[d]iscussions with several brokers * * * [which] revealed that average market rents in the Redwood City area in 1986 were typically lower than as reported in the BOMA survey." These brokers told Mansbach that rents for both retail space and office space, including ground floor commercial space, in the immediate subject area "generally averaged at $1.00 per square foot on a full service expense structure." These same brokers provided Mansbach with four leases that Mansbach considered comparable to the Redwood City Fox. All the

(continued...)

to account for much of the difference between Mansbach's value conclusions and the value conclusions of petitioners' experts. However, one overriding problem we have with all the appraisers' reports is their failure to consider the County of San Mateo's lease of the East retail space, both the ground floor and mezzanine, in their income capitalization analysis.

---

[48](...continued) comparable leases were for office space; none were for retail space. Additionally, comparable lease number 1, the "Jeanne Bishop" and comparable lease number 4, "Intermodel Delivery Service" have no address identified. Mansbach finds the comparable leases indicate a range of $1.00 to $1.30 per square foot per month. Mansbach states that the Second floor office space has "an attractive appearance which retains many of the historic and architectural details of the original structure." In spite of these facts, Mansbach still estimates a market rent at the lower end of the indicated range. For the mezzanines, to reflect their lower ceiling heights and his determination that they must be rented in conjunction with the ground floor retail areas, Mansbach estimates a "storage rent" of $.25 per month.

Based on our review of the lease comparables provided by the experts, and in light of the rent provided for in the County of San Mateo lease, we believe that the market rent estimated by Mansbach is too low.

Our second problem with Mansbach's estimate is his capitalization rate. Without consideration of the Jacobs lease, Mansbach estimated a 9-percent capitalization rate. The comparables presented by the experts indicate capitalization rates ranging from a low of 6.5 percent to a high of 10.5 percent. Based on the comparables, we find Mansbach's 9-percent capitalization rate too conservative under the circumstances.

Still another problem we have with Mansbach's estimate is, when considering the impact of the Jacobs lease under the income capitalization method, Mansbach still utilizes a capitalization rate of 9 percent. We believe this was an error. Although basically related to the rate of interest, the capitalization rate also includes risk and liquidity factors. See Narver v. Commissioner, 75 T.C. 53, 90 n.17 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Because 69 percent of the retail/office component was subject to a long-term lease, albeit below market, the risk of receiving that portion of income is slight. Consequently, we believe the capitalization rate should be reduced to reflect the lower of level risk.

The County of San Mateo leased the East retail space for the period of March 2, 1987, to December 1, 1987.  Rent was $4,720 per month, with the County of San Mateo paying utility expenses, including gas, electrical, and janitorial services.  However, the Players were responsible for paying all real property taxes. Based on our finding of 5,086 rentable square feet, the rental rate paid by the County of San Mateo equates to $.93 (rounded) per square foot per month.

We believe it is appropriate to estimate the value of the retail/office component of the Redwood City Fox by incorporating the actual income from the below-market Jacobs lease and from the County of San Mateo lease to calculate the total gross income of the property.  We find that a vacancy and collection loss of 5 percent is appropriate under the circumstances to arrive at effective gross income.  However, we agree with Carneghi that the vacancy and collection loss should not be deducted from the space subject to the Jacobs lease, because of the nature of the lease.

From effective gross income, we agree with Mansbach that deductions for management expenses of 3 percent of effective gross income and for reserves of 2 percent of effective gross income are appropriate.  We also find that a deduction for the real estate taxes the landlord must pay under the County of San Mateo lease to be appropriate.[49]  Finally, with respect to the

---

[49] Based on information provided by Mansbach in his appraisal report, we estimate the deduction for the real estate taxes to be $4,067.  We note that no deduction for real estate
(continued...)

proper capitalization rate, our review of the record persuades us that Carneghi's capitalization rate of 7.5 percent[50] is the most appropriate under the circumstances.

In accord with these findings, under the income capitalization approach, we arrive at a fair market value of $1,100,000 (rounded) for the retail/office component of the Redwood City Fox, calculated as follows:

| | | |
|---|---|---|
| Contract income-Jacobs lease | 11,205 sq.ft. at $0.27 | $3,000 |
| Contract income-Cty. of San Mateo lease | 5,086 sq.ft. at $0.93 | 4,720 |
| Monthly Gross Potential Income | 16,291 | 7,720 |
| | | X    12 |
| | | |
| Annual Gross Income | | 92,640 |
| Less: Vacancy and credit loss at | | |
|     Jacobs space          0.0% | | 0 |
|     Cty. of San Mateo space 5.0% | | 2,832 |
| Effective Gross Income | | 89,808 |
| | | |
| Less: Landlord expenses | | |
|     Reserves | 2.0% of effective gross income 1,796 | |
|     Management | 3.0% of effective gross income 2,694 | |
|     Property taxes | 4,050 | |
|     Total expenses | 8,540 | 8,540 |
| | | |
| Net Operating Income | | 81,268 |
| | | |
| Capitalization Rate | | 0.0750 |

---

[49](...continued)
taxes with respect to the space subject to the Jacobs lease is warranted, as Jacob was responsible for paying the real estate taxes.

[50] Carneghi found that

> Considering the quality of the subject * * * [Redwood City Fox], its lack of parking, the fact that the subject space is part of a larger building, and the small size, a rate of 8.0 percent is concluded. However, the below market lease for a majority of the space creates a low risk situation for the building owner which argues for a lower rate. Therefore an 7.5 percent rate is used for capitalization purposes.

| | |
|---|---|
| Indicated Value | $1,083,568 |
| Rounded | $1,100,000 |

C.  Value Conclusion

Based upon an analysis of all the valuation evidence introduced through both testimony and documentation, and giving due consideration to the credibility of the witnesses at trial, we hold that the fair market value of the Redwood City Fox as of December 31, 1986, the date of its donation to the Players, was $3,100,000.[51]

III.  Addition to Tax and Penalties

The final issue is whether Jacobs is liable for an addition to tax for negligence or disregard of rules or regulations under section 6653(a)(1) for taxable year 1988; and whether Jacobs is liable for accuracy-related penalties under section 6662 for negligence or disregard of rules or regulations, any substantial understatement of income tax, and/or any substantial valuation overstatement for taxable years 1989 and 1990.

A.  Addition to Tax for Negligence

For 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence or disregard of rules or regulations.  "Negligence" means any failure to make a reasonable attempt to comply with the Internal Revenue Code, and

---

[51] Respondent introduced evidence of the Redwood City Fox's assessed value for purposes of California real property taxes. We considered the property's 1986 assessed value for real estate tax purposes, but we find that value not to represent the Redwood City Fox's fair market value.

"disregard" includes any careless, reckless, or intentional disregard.  Sec. 6653(a)(3).

Negligence is defined as a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  However, reasonable reliance upon expert opinion, asserted in good faith, can shield a taxpayer from section 6653(a) additions to tax.  United States v. Boyle, 469 U.S. 241, 250 (1985); Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. T.C. Memo. 1987-217.

We find that Jacobs reasonably relied upon the expert opinions of Ingram and Ewing, as well as those contained in the Adamson report, when he claimed the charitable deduction at issue.  Both Ingram and Ewing were licensed real estate appraisers in California.  Their valuation report is detailed and complete, and was attached to Jacobs' Federal income tax return for taxable year 1986.  While Jacobs has considerable knowledge regarding real estate development, we think the evidence of his knowledge falls short of requiring him to second-guess licensed appraisers.  Hence, under these circumstances, we do not find Jacobs negligent.  Accordingly, we hold that he is not liable for the section 6653(a) addition to tax for negligence for 1988.

B.  Accuracy-Related Penalties

For 1989 and 1990, section 6662(a) imposes an accuracy-related penalty of an amount equal to 20 percent of the portion

of the underpayment attributable to negligence or disregard of rules or regulations, any substantial understatement of income tax, or any substantial valuation overstatement. See sec. 6662(b)(1)-(3). The section 6662 accuracy-related penalty does not apply with respect to any portion of an underpayment if reasonable cause exists for the underpayment and the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether the taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances. Sec. 1.6664-4(b), Income Tax Regs. The most important factor in determining reasonable cause is the extent of the taxpayer's effort to assess the proper tax liability. Sec. 1.6664-4(b), Income Tax Regs.

In our judgment, Jacobs acted with reasonable cause and in good faith when he claimed the charitable contribution deduction for his donation of the Redwood City Fox. Accordingly, we hold that he is not liable for the section 6662 accuracy-related penalties for 1989 and 1990.

To reflect the foregoing,

Decisions will be entered
under Rule 155.